# ATTACHMENT 1



ATLAS SAFETY & SECURITY DESIGN, INC.

# EXPERT REPORT OF RANDALL I. ATLAS, PH.D., AIA, CCP

I have been retained as an accessibility expert by the State of Georgia regarding Americans with Disabilities Act Title II non-compliance. The cases involved are <u>Tracy Miller v. King, et al.</u>, United States District Court, Southern District of Georgia, Civil Action No. 6:98-CV-0109JEG, and <u>Tony Goodman v. Donald, et al.</u>, United States District, Southern District Court of Georgia, Civil Action No. 6:99-CV-012JEG. This report, in accordance with Federal Rule of Civil Procedure 26(a)(2)(B), sets forth my opinions that I have reached in these cases to present date. As additional materials become available I reserve the right to update these opinions as necessary.

The scope of my work was to review the expert report of Plaintiffs' expert Mark Mazz AIA, review the facts of the cases, and tour the Augusta State Medical Prison and the Georgia State Prison for remedial measures taken to comply with the Americans with Disabilities Act. I did not have an opportunity to tour the Georgia Diagnostic and Classification Prison but I was presented documents and information that I will discuss with respect to this institution being ADA compliant.

## QUALIFICATIONS

I have been qualified as an expert in accessibility and the ADA, especially on Title II Program and Services Accessibility. I was appointed by the U.S. Department of Justice to serve on the National Institute of Justice Advisory Board on the Americans with Disabilities Act in 1992. I am a registered architect in Florida and Louisiana, and NCARB certified. My education consists of a bachelor and master degrees of architecture, a bachelor degree of criminal justice, and a doctorate of criminology. I have worked for major architecture firms that design jails and prisons, and have consulted on the design and operation of jails and prisons with my own firm since 1988. I have served as a technical assistance consultant with the National Institute of Corrections and conducted approximately 20 assessments for them since 1983. I am a member of the American Institute of Architects, and appointed member of the Architecture of Justice Committee. I have conducted ADA trainings for the U.S. Department of Justice around the country and have also conducted trainings for the Florida, Hawaii, and Louisiana Department of Corrections.

I have also written many papers on ADA and the impact on corrections and been published in Corrections Today and American Jail Association magazines. I am presently a member of the American Corrections Association and am a past member the American Jail Association. I have contributed a chapter in the publication "Planning and Design Guide for Secure Adult and Juvenile Facilities", titled Americans With Disabilities Act and Correctional Facilities. (See CV, Exhibit "A").

## COMPENSATION

My fee schedule is attached as Exhibit "B". Thus far, I have only received a retainer.

## PRIOR TESTIMONY

All of my prior testimony is documented on my case list attached as Exhibit "C".

## DOCUMENTS CONSIDERED FOR MY OPINION

In the preparation of this report I have reviewed the following documents:
- Amended Complaint of Civil Action No. CV 6:98-109-JEG
- Diagrams of each prison
- Mazz Expert Report
- Tough on Crime and the Budget. GBPI. January 2008
- Department of Corrections Funding By Year By Institution for ADA Compliance
- ADA Standards for Accessible Design, excerpt from 28 CFR Part 36 revised July 1, 1994
- Architectural and Transportation Barriers Compliance Board. 36 CFR Part 1191 Americans with Disabilities Act Accessibility Guidelines for Building and Facilities; Chapter 12 Detention and Correctional Facilities; Proposed Rules December 21, 1992
- Uniform Federal Accessibility Standards (UFAS)
- Schedule of services and programs offered at each prison
- Recent work repair logs for each prison
- Standard Operating Procedures for Inmate Classification and Inter-Institutional Transfers
- ADA compliance memorandums for ASMP

## PRESENT DURING EVALUATIONS OF ASMP AND GSP AND AVAILABLE FOR QUESTIONS

Steve Jones-Program manager, Architectural and Engineering;
Victor Walker, Warden-ASMP;
T.J. Conley, Deputy Warden of Security-ASMP;
Scott Wilkes, Deputy Warden of Treatment;
Sharon Davis, Administrative Assistant;
Steve Upton, Warden-GSP; and
Wendall Fowler, Deputy Warden/Administration-GSP

## ADA Title II and Correctional Facilities

In order to determine if the identified facilities at the Georgia Department of Corrections can comply with Title II requirements of the ADA and how to comply, it is important to review the history and evolution of ADA and UFAS as it applies to prison world. **The primary service of correctional facilities is to help maintain public safety through incarceration of offenders. Classification to determine placement within the system is based on many factors such as security requirements, medical needs, and other administrative determinates. Accessibility is another one of these factors in the classification process.** Given the mission of detention

and correctional facilities, it is appropriate to provide equal accessibility to programs, service, and activities in an integrated environment in the most economic manner possible which includes mitigating staffing costs, making use of community resources and grouping inmates with disabilities to provide specialized services or training.

## DEPARTMENT OF JUSTICE Office of the Attorney General 28 CFR PART 35

**Nondiscrimination on the Basis of Disability in State and Local Government Services**

**Action: Final rule.**

**Summary:** This rule implements subtitle A of title II of the Americans with Disabilities Act, Pub. L. 101-336, which prohibits discrimination on the basis of disability by public entities. Subtitle A protects qualified individuals with disabilities from discrimination on the basis of disability in the services, programs, or activities of all State and local governments. It extends the prohibition of discrimination in federally assisted programs established by section 504 of the Rehabilitation Act of 1973 to all activities of State and local governments, including those that do not receive Federal financial assistance, and incorporates specific prohibitions of discrimination on the basis of disability from titles I, III, and V of the Americans with Disabilities Act. This rule, therefore, adopts the general prohibitions of discrimination established under section 504, as well as the requirements for making programs accessible to individuals with disabilities and for providing equally effective communications. It also sets forth standards for what constitutes discrimination on the basis of mental or physical disability, provides a definition of disability and qualified individual with a disability, and establishes a complaint mechanism for resolving allegations of discrimination.

**EFFECTIVE DATE:** January 26, 1992.

### ADA Title II -Subpart D -- Program Accessibility

Except as otherwise provided in {35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

**{35.150 Existing facilities.**

(a) *General.* A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not --

> (1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

> (2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

> (3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue

financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with {35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

(b) *Methods*. (1) *General*. A public entity may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of {35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

## Statutory Background of the ADA

The Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. 12101 et seq.) extends to individuals with disabilities comprehensive civil rights protections similar to those provided to persons on the basis of race, sex, national origin, and religion under the Civil Rights Act of 1964. Title II of the ADA, which became effective on January 26, 1992, prohibits discrimination on the basis of disability in services, programs and activities provided by State and local government entities, and the National Railroad Passenger Corporation (Amtrak). Section 202 of the ADA extends the nondiscrimination policy of section 504 of the Rehabilitation Act of 1973, as amended, (29 U.S.C. 794), which prohibits discrimination on the basis of disability in federally assisted programs and activities to all State and local governmental entities whether or not such entities receive Federal funds.

Most programs and activities of State and local governments are recipients of financial assistance from one or more Federal agencies and are already covered by section 504 of the Rehabilitation Act of 1973. Title III of the ADA, which also became effective on January 26, 1992, prohibits discrimination on the basis of disability by private entities who own, lease, lease to, or operate a place of public accommodation. Title III establishes accessibility requirements for new construction and alterations in places of public accommodation and commercial facilities. Section 504 of the ADA requires that the Access Board issue minimum guidelines to assist the Department of Justice and the Department of Transportation in establishing accessibility standards under titles II and III. Under sections 204(a) and 306(b) of the ADA, the Department of Justice is responsible for issuing final regulations, consistent with the guidelines issued by the

Access Board, to implement titles II and III (except for transportation vehicles and facilities). Sections 229 and 306(a) of the ADA provide that the Department of Transportation is responsible for issuing regulations to implement the transportation provisions of titles II and III of the ADA. Those regulations must also be consistent with the Access Board's guidelines.

On July 26, 1991, the Department of Justice published its final regulations implementing title III of the ADA which incorporated ADAAG as the accessibility standards for newly constructed and altered places of public accommodation and commercial facilities covered by title III. See 56 FR 35544, 28 CFR Part 36. On that same date, the Department of Justice published its final regulations implementing title II of the ADA. The Department of Justice's title II regulations give State and local governments the option of choosing between designing, constructing or altering their facilities in conformance with the Uniform Federal Accessibility Standards (UFAS). UFAS was developed by the General Services Administration, Department of Defense, Department of Housing and Urban Development, and the United States Postal Service to implement the Architectural Barriers Act of 1968 (42 U.S.C. 4151 *et seq.*) which requires certain federally financed buildings to be accessible. Most Federal agencies reference UFAS as the accessibility standard for buildings and facilities constructed or altered by recipients of Federal financial assistance for purposes of section 504 of the Rehabilitation Act of 1973, as amended.

When the Department of Justice published its title II regulations, it noted that the Access Board would be supplementing ADAAG in the future to include additional guidelines for State and local government facilities. The Department of Justice further stated that it anticipated that it would amend its title II regulations to adopt ADAAG as the accessibility standards for State and local government facilities after the Access Board supplemented ADAAG, 56 FR 35694, 35711 (July 26, 1991).

On December 21, 1992, the Access Board published a notice of proposed rulemaking (NPRM) in the **Federal Register,** which proposed adding four special application sections to ADAAG specifically applicable to certain types of buildings and facilities covered by title II of the ADA. Those special application sections include: 11. Judicial, Legislative, and Regulatory Facilities, and 12. Detention and Correctional Facilities. On June 20, 1994, the Access Board published an interim rule in the **Federal Register,** which added sections 11 through 14 and miscellaneous provisions to ADAAG, 59 FR 31676 (June 20, 1994) as corrected at 59 FR 32751 (June 24, 1994).

The Access Board's guidelines provide guidance to the departments of Justice and Transportation in establishing accessibility standards for new construction and alterations of State and local government facilities covered by title II of the ADA. The standards ultimately established by those departments must be consistent with and may incorporate the guidelines. It is important to note that until such time as the Department of Justice or the Department of Transportation adopts these guidelines as standards, the guidelines are advisory only and not to be construed as requirements.

ADAAG Chapter 12 (Detention and Correctional Facilities) requires that public entrances, including entrances that are secured, shall be accessible as required by 4.1.3(8). This requirement does not increase the number of entrances required to be accessible by 4.1.3(8) and provides an exception from certain ADAAG specifications for doors and doorways. This exception applies to doors or doorways operated only by security personnel or where security requirements prohibit full compliance with the guidelines. See ADAAG 12.2.1. A cross reference to this section has been added to 4.1.3(8)(a) in the final rule.

**Federal Register** / Vol. 63, No. 8 / Tuesday, January 13, 1998 / Rules and Regulations **2011**

*Chapter 12. Detention and Correctional Facilities*
This section addresses detention and correctional facilities where occupants are under some degree of restraint or restriction for security reasons and provides scoping and technical requirements for accessible cells or rooms.

*12.1 General*
This provision identifies the types of facilities covered by Section 12, including jails, prisons, reformatories, and juvenile detention centers. All public areas and those common use areas serving accessible cells are subject to existing ADAAG, except the requirements for areas of rescue assistance and signage. In response to inquiries concerning the need for elevator access or complying stairs to the upper tiers of housing facilities where there are no accessible cells, an exception has been added in the final rule. Under this exception, an elevator complying with 4.10 or stairs complying with 4.9 are not required in multi-story housing facilities where accessible cells or rooms and all common use areas serving them, as well as all public use areas, are on an accessible route.

*12.2 Entrances and Security Systems*
This section covers entrances and security screening devices. Section 12.2.1 requires that public entrances, including those that are secured, be accessible as required by ADAAG 4.1.3(8). Entrance doors that are operated by security personnel are exempt from the requirements in ADAAG 4.13 (Doors) for door hardware, opening forces, and automatic doors. Doors subject to security requirements prohibiting full compliance with the provisions of ADAAG 4.13 are similarly exempt. The exception in 12.2.1 may apply to doors used by persons other than inmates and facility staff, such as counselors and instructors. It is important that evacuation planning address egress for all persons who may access secured areas since a person with a disability might not be able to independently operate doors meeting this exception. This consideration has been included in an appendix note.

Section 12.2.2 requires that an accessible route be provided through or around security screening devices located at accessible entrances. Section 12.2.2 has been editorially revised to reference a circulation path in lieu of a path of travel. Section 12.2.2 of the interim rule contained requirements for entrances and passenger loading zones used only by inmates or detainees and security personnel. These requirements have been removed in the final rule as ADAAG 4.1.3(8) addresses all types of entrances except service entrances and ADAAG 4.1.2(5) addresses passenger-loading zones.

*Comment.* In the interim rule, the exception in 12.2.1 for doors subject to security requirements required compliance to the ''maximum extent feasible.'' One comment from a State agency recommended that this term be removed because it complicates enforcement.

*Response.* The term ''maximum extent feasible'' has been removed from the exception in 12.2.1 and the exception has been further modified for clarity. In addition, a reference in this exception to ADAAG 4.13.6, which specifies maneuvering clearances at doors, including latch-side clearance, has been removed. This reference had been included in the interim rule for doors operated by security personnel since such operation precludes the need for clearance at the latch

side of doors. However, since ADAAG 4.13.6 also contains specifications for maneuvering space, which is essential for passage through doors, including those operated by security personnel, the exemption from 4.13.6 has been removed. The requirements in ADAAG 4.13.6 are not known to pose any conflict with security requirements for doors. An identical exception in 12.5.2(1) for doors and doorways serving holding or housing cells has been similarly modified.

*12.3 Visiting Areas*
This section addresses non-contact visiting areas. At least five percent of fixed cubicles on both the public and secured side must be accessible under 12.3(1). Accessible cubicles for inmates or detainees are required only in those visiting areas serving accessible housing or holding cells. Section 12.3(2) requires cubicles separated by solid partitions to be equipped with devices to facilitate voice communication. These requirements are consistent with those for visiting areas covered by section

*12.4 Holding and Housing Cells or Rooms: Minimum Number*
This section requires that a minimum of *two percent*, but not less than one, of the total number of holding or general housing cells or rooms provided in a facility be accessible in new construction. The interim rule provided that at least three percent, but not less than one, of the total number of housing or holding cells or rooms provided in a facility shall be accessible.
*Comment.* Most comments from detention and correctional authorities considered the three percent minimum specified in the interim rule excessive in view of the demonstrated need. Several State correctional agencies recommended one percent. The Illinois Department of Corrections and 33 concurring State correctional agencies urged that the minimum not exceed two percent. One disability organization supported the three percent requirement. With respect to detention facilities, one county government, recommended one percent for holding cells. Most of the recommendations for a lower percentage were based on survey data submitted in response to the NPRM. As noted in the interim rule, among various responding States, the percentage of inmates with mobility impairments ranged from .12 to 1.35 percent and the average was .46 percent. A survey conducted by the Association of State Correctional Administrators (ASCA) provided a significantly higher average of 3.39 percent, suggesting that a wider range of disabilities, not just mobility impairments, was included. In response to the interim rule, the California Department of Corrections compiled additional survey data from States, the ASCA, and the Federal Bureau of Prisons. The results of that survey indicated that the average percentage of inmates with some type of disability is 1.56 percent. The three percent minimum specified in the interim rule was based in part on the aging of the prison population, a consideration several commenters raised, and existing data demonstrating that the prevalence of disability increases with age. However, comments from State correctional agencies to the interim rule indicated that the perceived aging of the prison population is not supported by current demographic data.
*Response.* Consistent with a large majority of commenters, as well as the survey data provided, the minimum number of holding or general housing cells or rooms required to be accessible in new construction has been reduced to *two percent*.
*Dispersion.* The interim rule provided that accessible cells shall be dispersed among all categories and types of general housing and holding areas. The final rule does not contain a requirement for dispersion of accessible cells.
*Comment.* Many comments from State and local corrections officials reiterated arguments made in response to the NPRM that accessible cells should be required on a system-wide basis instead of for each newly built or altered facility. This would provide a level of administrative discretion operators consider essential in determining which facilities of a system are appropriate for

housing inmates with disabilities. According to the commenters, the availability of certain programs, services, and staff, not just architectural, accessibility, are important criteria in making this determination and that freedom of choice, a fundamental consideration in ensuring access to public housing and transient lodging, is not pertinent to the assignment of housing among inmates.

According to the commenters, provision of accessible cells in an alteration will by no means ensure that the necessary level of access to programs, services, common use areas and other amenities available to inmates will be achieved. According to commenters, providing access in some existing facilities will waste limited resources and lead to a greater number of accessible cells available only to inmates without disabilities where misuse of elements, such as grab bars, is more likely to occur. Thus, correctional authorities recommended that a percentage of accessible cells be required for the entire system instead of at each newly constructed or altered facility.

*Response.* New construction presents the greatest opportunity for access. Why this would not hold true for detention and correctional facilities was not clearly indicated in comments. Rather, the concerns expressed in this area are relevant primarily to the requirement for access in alterations in 12.4.5 (Alterations to Cells or Rooms). In the interim rule, this provision applied the minimum scoping percentage of new construction to the total number of cells or rooms altered in a facility. Alterations provide important opportunities for access as recognized by the ADA; however, corrections authorities make a compelling case for allowing discretion in detention and correctional facilities. Concerns of practicality, and those of feasibility, raised in the NPRM, and various operational factors indicate that in many instances the cost of achieving access at many existing facilities will greatly outweigh the benefits. For these reasons, section 12.4.5 and the requirement for alterations have been reserved, thus limiting to new construction the two percent scoping requirement. This requirement has been reserved, rather than permanently removed, since it may be revisited in the future. Further, there will be instances when the opportunities for access in alterations should be considered, particularly where a system has few, if any, accessible cells. In certain cases, complying with the requirements of section 12 may be practical, technically feasible, and facilitate compliance with other ADA requirements, including those for program access. While reserving this requirement may pose confusion over the minimum level of access required in alterations, the obligation correctional entities have in providing program access may effectively and practically determine the degree of access that should be provided in an alteration. The Department of Justice's title II regulation states that public entities must operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and useable by individuals with disabilities. Thus, the lack of a specific requirement for accessible prison alterations does not excuse a public entity from providing access to all of the prison's programs and services, when viewed in their entirety.

*Comment.* The interim rule contained a requirement that accessible cells be dispersed among each type or category of housing or holding cells. A few commenters recommended that prison operators have greater discretion in locating cells on a site. The Bureau of Prisons noted that according to its records inmates with disabilities are rarely housed in maximum security facilities and recommended that accessible cells not be required in this category of housing.
*Response.* The requirement for dispersion of accessible cells in each category or type of housing or holding cell has been removed. Thus, at sites where different categories of housing or levels of security are provided, operators need not locate accessible cells in each category or security level. A recommendation that accessible cells be dispersed among different types of holding cells and different categories and security levels of housing has been added to an appendix note.

*Comment.* Several commenters requested clarification that the minimum percentage applies to a facility generally and that accessible cells are not required in each building of a facility.
*Response.* The minimum scoping requirement of two percent is based on the total number of housing or holding cells or rooms provided in a "facility." As defined in ADAAG 3.5 (Definitions), the term "facility" includes the buildings and structures of a site. While the percentage is based on the total number of cells or rooms that may be provided at a site, the location of accessible cells or rooms in each building is not required.

*12.4.2 Special Holding and Housing Cells or Rooms.* This section requires that where holding or housing cells or rooms are provided for special purposes, at least one of each type must be accessible. This includes those used for purposes of protective custody, disciplinary detention, detoxification, and medical isolation.
*Comment.* One correctional authority recommended that this requirement reference other purposes, including disciplinary segregation, administrative detention, and orientation.
*Response.* These special purposes have been added to the requirement.
*Comment.* The interim rule noted that "an accessible special holding or housing cell or room may serve more than one purpose." One disability organization indicated that this should only be permitted where inaccessible cells also serve multiple purposes, otherwise inmates with disabilities may not have access to the same level of service provided. This comment also suggested that a recommendation be included in the appendix for a greater number of accessible special purpose cells at large facilities.
*Response.* The statement concerning accessible cells serving more than one purpose has been removed to ensure equivalency in the provision of access. Accessible special holding cells may serve more than one purpose where other special holding cells serve more than one purpose. Where special holding cells serve different purposes, then one of each type must be accessible. This clarification has been included as an appendix note to 12.4.2. Also added to this appendix note is a recommendation that more than one of each type should be accessible in large facilities where a number of cells of each type serve different holding areas or housing units.
*Comment.* One correctional agency recommended that this section should only apply to those medical isolation used for that purpose, and not general housing cells or medical care rooms that may also be used to isolate inmates for medical purposes.
*Response.* An appendix note in the interim rule that distinguished between medical isolation cells covered by 12.4.2 and patient bedrooms covered by 12.4.4 has been relocated to this section. Additional clarification has been added to this appendix note indicating that 12.4.2 applies to cells specifically designed for purposes of medical isolation.
*Comment.* One corrections agency recommended that cells or rooms used to monitor inmates or detainees likely to attempt suicide be exempt from the requirement for grab bars. Such cells or rooms are typically designed without any protrusions.
*Response.* The NPRM asked questions concerning grab bars and the risk of suicide. A majority of the responses did not generally regard grab bars as posing a greater risk since effective suicide prevention is based on a variety of measures, including evaluation, classification, and surveillance of inmates, not just cell design. However, the installation of grab bars may complicate the design of facilities that are used for the purpose of suicide watch. An exception to the requirement in ADAAG 4.16 (Water closets) for grab bars has been added for cells or rooms specially designed to be used solely for the purpose of suicide prevention.

*12.4.3 Accessible Cells or Rooms for Persons with Hearing Impairments.* This section requires access for persons who are deaf or hard of hearing in housing or holding cells or rooms equipped with audible emergency warning systems or permanently installed telephones.
*Comment.* One State correctional authority recommended that the scoping be reduced from three