to one percent based on survey data received in response to the NPRM.
*Response.* The data received in response to the NPRM indicated that the population of inmates who are deaf or hard of hearing is only slightly higher than the population of inmates with mobility impairments. Consistent with the requirement for accessible cells in section 12.4.1, the minimum scoping has been reduced from three to two percent.

*12.4.4 Medical Care Facilities.* This section applies the requirements of ADAAG 6 (Medical Care Facilities) to medical care facilities in detention and correctional facilities. Few comments addressed this provision and no changes have been made.

*12.4.5 Alterations to Rooms or Cells.*
This section has been reserved. See the discussion under 12.4.1 (Holding Cells and General Housing Cells or Rooms), "Dispersion".

12.5 *Requirements for Accessible Cells or Rooms.*
This section contains the minimum requirements for accessible cells or rooms. These requirements, which are similar to those for holding cells in judicial facilities in ADAAG 11.4 (Courthouse Holding Facilities), are based primarily on existing ADAAG specifications, including those for transient lodging in section 9 (Accessible Transient Lodging). Requirements are provided for doors and doorways, toilet and bathing facilities, beds, drinking fountains, fixed seating and tables, benches, storage, controls, and accommodations for persons with hearing impairments. The majority of the comments received in response to this provision addressed restrooms, beds, and fixed seating and tables. Section 12.5.2 has been revised to address those situations where a covered element or space serves an accessible cell or room but is located outside the cell or room.
   *(1) Doors and Doorways.*
This section contains an exception for doors that are operated only by security personnel or subject to security requirements prohibiting full compliance from the requirements in ADAAG 4.13 (Doors). This exception has been modified consistent with 12.2.1 and 12.2.2. (For further discussion of the modifications, see 12.2 (Entrances).
   *(2) Toilet and Bathing Facilities.*
*Comment.* Several commenters recommended that a grab bar shorter than the required 36 inches be permitted behind water closets so that combination lavatory and water closet units may be used. Currently, such units are equipped with a grab bar approximately 24 inches long. A manufacturer of such units indicated that developing a fully compliant unit is cost-prohibitive.
*Response.* An exception for the length of the rear grab bar on combination units has not been provided since separate, accessible lavatories and toilets are readily available. For further discussion, see 11.4.2 (Requirements for Accessible Cells).
*Comment.* One commenter recommended that floor-mounted grab bars be permitted.
*Response.* ADAAG does not specifically address floor-mounted grab bars. However, in some situations they may provide an effective alternative to wall-mounted grab bars so long as the requirements of ADAAG 4.26 (Handrails, Grab Bars, and Tub and Shower Seats), including the specifications for structural strength, are met.
   *(3) Beds.*
*Comment.* Several comments addressed the requirements for beds. One comment recommended that the minimum clear floor space required along one side of beds be 5 feet long instead of the full length of the bed. One comment from an inmate with a disability recommended that headroom between bunk-beds be specified while another commenter advised the height of beds should be 19 to 21 inches.
*Response.* Clear floor space 36 inches wide is required along side of beds the full length.

However, elements, such as writing counters, may overlap this space so long as the required knee and toe clearance is provided. An appendix note provides some guidance on headroom between bunk beds and recommends a height for beds of 17 to 19 inches based on existing ADAAG requirements for water closets and benches. No changes have been made to this provision. Technical inquiries have been received concerning the number of beds that should be accessible in large barracks-style rooms with many beds. Since beds may not be fixed, a minimum number of accessible beds are not specified in this section, consistent with existing ADAAG. However, a recommendation has been added to the appendix that the minimum scoping for cells or rooms (two percent) also be applied to the number of beds in large cells or rooms with many beds.

*(4) Drinking Fountains.*
*(5) Fixed or Built-In Seating and Tables.*
*(6) Fixed Benches.*

One comment concerning fixed or built-in seating and tables seemed to confuse the requirements of section 12.5.2 with those for common use areas in 12.1. Section 12.5.2 applies only to elements located within accessible cells or rooms. Those elements located outside cells for common use by inmates, such as in dayrooms which adjoin cells, are subject to 12.1 and its application of existing ADAAG for common use areas serving accessible cells. An appendix note has been added to 12.5.2 to clarify this. In addition, the requirements in 12.5.2 for drinking fountains, fixed or built-in seating and tables, and fixed benches have been modified to more clearly apply to elements located within housing or holding cells. Paragraph (4) has been modified to require ''at least one'' wheelchair accessible drinking fountain where provided within a holding or housing cell. Drinking fountains located in common use areas requirement that drinking fountains be accessible to both persons using wheelchairs and those who may have difficulty bending or stooping. Paragraph (5), which covers fixed or built-in seating and tables, and paragraph (6), which addresses fixed benches, has been similarly modified. In addition, paragraph (6) has been modified to require fixed benches to be mounted to the wall or provide back support.

*(7) Storage.*
*(8) Controls.*
*(9) Accommodations for Persons with Hearing Impairments.*

Few comments addressed these sections and no changes have been made to these provisions.

*12.6 Visual Alarms and Telephones*

This section contains technical requirements for cells that are accessible to persons who are deaf or hard of hearing. Section 12.6 requires that where cells are equipped with audible emergency warning systems, a visual alarm complying with ADAAG 4.28.4 (Auxiliary Alarms) shall also be provided. This section also requires that permanently installed telephones, if provided in cells, shall have volume controls complying with ADAAG 4.31.5 (Hearing Aid Compatible and Volume Control Telephones). An exception from the requirement for visual alarms is provided where inmates or detainees are not allowed independent means of egress. No substantive changes have been made to this provision. The interim final rule clarified that portable devices may be used in lieu of permanent devices if necessary wiring and outlets are provided. This was noted as an example of ''equivalent facilitation,'' a provision in ADAAG 2.2 that permits alternative designs that provide equal or greater access. Since equivalent facilitation pertains to all ADAAG provisions, this specific example has been removed in the final rule.

*Comment.* The Committee on Acoustics in Corrections recommended that design guidelines on

acoustics developed by the American Correctional Association should be incorporated in section 12. These specifications are particularly essential in the noisy environments of detention and correctional facilities and may help prevent hearing loss caused by constant exposure to loud noise.

*Response.* Guidelines for acoustics have not been incorporated into this rule because none had been previously recommended or proposed and made available for public comment. While acoustics in correctional facilities is an important design consideration, it involves concerns such as prevention of hearing loss, that lie beyond the scope of ADAAG and its minimum criteria for access to the built environment. Some of these issues may be more appropriately addressed by agencies that oversee correctional systems or provide accreditation.

*13. Accessible Residential Housing*

In the interim rule, ADAAG 13 addressed accessibility requirements for residential facilities. This section has been reserved in the final rule. Since the publication of the interim rule, the American National Standards Institute (ANSI) A117 Committee has developed a draft proposal to add new sections pertaining to accessible and adaptable residential housing to the CABO/ANSI A117.1 standard. The CABO/ANSI standard for Accessible and Usable Buildings and Facilities will be revised in 1997 to incorporate these new technical and scoping provisions. The Access Board is committed to coordinating its guidelines with private sector standards and model codes to the extent possible. The development of
accessibility standards for accessible residential housing by the ANSI committee at the time the Access Board is publishing guidelines in the same area, presents a unique opportunity for the Access Board to promote greater uniformity in accessibility standards. Accordingly, the Access Board is reserving ADAAG 13 (Accessible Residential Housing) until it has an opportunity to review the final CABO/ANSI standard. Upon completion of its review, the Access Board will issue guidelines for accessible residential housing.

*14. Public Rights-of-Way*

In the interim rule, ADAAG 14 included provisions for new construction and alterations of pedestrian and related facilities in the public rights-of-way. This section has been reserved in the final rule.

*Comment.* The majority of the comments received in response to the NPRM and the interim rule concerned ADAAG 14 (Public Rights-of-Way). Commenters were particularly concerned with the application of the new construction provisions of section 14 to existing facilities. Many of these commenters, including public works, agencies, transportation departments, and traffic consultants, were concerned that ADAAG 14.1 would be applied to transition plan construction, and in particular, the number, location, and design of curb ramps, in existing developed rights-of-way.

*Response.* Section 14 of the interim rule contained new construction provisions which were not intended to apply to existing facilities in the public right-of-way. With respect to alterations, section 14 contained less stringent scoping and technical provisions for alterations to established rights-of-way where there is site infeasibility. Few critical comments were directed to the accessibility requirements for alterations. The response to both the NPRM and the interim rule clearly indicated the need for substantial education and outreach regarding the application of guidelines in this area. Pedestrian facility design, and in particular, accessible pedestrian design, is a new responsibility for many traffic engineers. Within the highway industry, there is disparate understanding of pedestrian accessibility criteria generally, and the application of the ADAAG 14 provisions for new construction contained in the interim rule, in particular. As a result, the Access Board has elected to reserve ADAAG 14 (Public Rights-of-Way) in this final rule.

The Access Board has embarked upon an ambitious program of outreach to governmental and private sector organizations in the transportation industry to promote the incorporation of pedestrian accessibility criteria into current and proposed industry guidelines, standards, and recommended practices. The guidelines contained in section 14 of the interim rule have been adopted by the State of Alabama and are being used to guide policies on pedestrian accessibility in the States of California, New Jersey and Florida. Several cities, including Portland, Oregon and Seattle, Washington have pedestrian planning requirements that are substantially similar to those contained in the interim rule. In a future rulemaking, the Access Board will review its education and outreach program and the impact of the States' and localities' regulatory efforts in this area, and will consider publication of requirements for accessibility in the public right-of-way.

The Access Board's guidelines issued under the **Americans with Disabilities Act** (ADA) and the **Architectural Barriers Act** (ABA) have been completely updated and revised in July 23, 2004. The ADA Accessibility Guidelines (ADAAG) cover the construction and alteration of facilities in the private sector (places of public accommodation and commercial facilities) and the public sector (state and local government facilities). The accessibility guidelines issued under the ABA primarily address facilities in the Federal sector and others designed, built, altered, or leased with Federal funds. The guidelines under both laws have been updated together in one rule that contains three parts: a scoping document for ADA facilities, a scoping document for ABA facilities, and a common set of technical criteria that the scoping sections will reference. As a result, the requirements for both ADA and ABA facilities will be made more consistent.

*ADA Architectural Barriers Act Final Guidelines*

*232 Detention Facilities and Correctional Facilities*
*232.1 General.* *Buildings, facilities,* or portions thereof, in which people are detained for penal or correction purposes, or in which the liberty of the inmates is restricted for security reasons shall comply with 232.

*Advisory 232.1 General.* Detention facilities include, but are not limited to, jails, detention centers, and holding cells in police stations. Correctional facilities include, but are not limited to, prisons, reformatories, and correctional centers.

*232.2 General Holding Cells and General Housing Cells.* General holding cells and general housing cells shall be provided in accordance with 232.2.
*EXCEPTION:* Alterations to cells shall not be required to comply except to the extent determined by the Attorney General.

*Advisory 232.2 General Holding Cells and General Housing Cells.* Accessible cells or rooms should be dispersed among different levels of security, housing categories, and holding classifications (e.g., male/female and adult/juvenile) to facilitate access. Many detention and correctional facilities are designed so that certain areas (e.g., "shift" areas) can be adapted to serve as different types of housing according to need. For example, a shift area serving as a medium-security housing unit might be redesignated for a period of time as a high-security housing unit to meet capacity needs. Placement of accessible cells or rooms in shift areas may allow additional flexibility in meeting requirements for dispersion of accessible cells or rooms.

*Advisory 232.2 General Holding Cells and General Housing Cells Exception.* Although these requirements do not specify that cells be accessible as a consequence of an

alteration, title II of the ADA requires that each service, program, or activity conducted by a public entity, when viewed in its entirety, be readily accessible to and usable by individuals with disabilities. This requirement must be met unless doing so would fundamentally alter the nature of a service, program, or activity or would result in undue financial and administrative burdens.

*232.2.1 Cells with Mobility Features.* At least 2 percent, but no fewer than one, of the total number of cells in a *facility* shall provide mobility features complying with 807.2.

*232.2.1.1 Beds.* In cells having more than 25 beds, at least 5 percent of the beds shall have clear floor *space* complying with 807.2.3.

*232.2.2 Cells with Communication Features.* At least 2 percent, but no fewer than one, of the total number of general holding cells and general housing cells equipped with audible emergency alarm systems and permanently installed telephones within the cell shall provide communication features complying with 807.3.

*232.3 Special Holding Cells and Special Housing Cells.* Where special holding cells or special housing cells are provided, at least one cell serving each purpose shall provide mobility features complying with 807.2. Cells subject to this requirement include, but are not limited to, those used for purposes of orientation, protective custody, administrative or disciplinary detention or segregation, detoxification, and medical isolation.

*EXCEPTION:* *Alterations* to cells shall not be required to comply except to the extent determined by the Attorney General.

*232.4 Medical Care Facilities.* Patient bedrooms or cells required to comply with 223 shall be provided in addition to any medical isolation cells required to comply with 232.3.

*232.5 Visiting Areas.* Visiting areas shall comply with 232.5.

*232.5.1 Cubicles and Counters.* At least 5 percent, but no fewer than one, of cubicles shall comply with 902 on both the visitor and detainee sides. Where counters are provided, at least one shall comply with 904.4.2 on both the visitor and detainee or inmate sides.
*EXCEPTION:* The inmate or detainee side of cubicles or counters at non-contact visiting areas not serving holding cells or housing cells required to comply with 232 shall not be required to comply with 902 or 904.4.2.

*232.5.2 Partitions.* Where solid partitions or security glazing separate visitors from detainees or inmates at least one of each type of cubicle or counter partition shall comply with 904.6.

## Accessibility To Date

I toured ASMP and GSP to observe the delivery of the programs, services and activities and the compliance thresholds with Title II Chapter 12 requirements. Regardless of what the conditions and practices of the prisons were in 1997 and 1998, when the lawsuits were filed, I was charged with evaluating the conditions in today's correctional environment to comply with reasonable accommodations and program accessibility.

**Augusta State Medical Prison**

The Department of Corrections has embraced ADA and the need to make designated facilities fully compliant. The Augusta State Medical Prison is the facility within the prison system most completely and successfully adapted to architectural barrier removal and program accessibility.

The facility holds 1300+ inmates. Buildings 1- 6 of the facility were built in 1982. The dorm housing Building 14 was built in 1998. The Augusta Prison's mission statement is to serve as the primary medical facility for the state prison system and provide nursing housing units for the medical rehabilitation of inmates. Inmates with mobility impairments are classified and sent to the Augusta facility. Inmates with other disabilities, but able-bodied, can be sent to other facilities throughout the state. The required 2 percent of compliant accessible housing would require at least 26 cells to be fully accessible.

Tracy Miller is housed in Unit 2B-4. This cell is ADA compliant. Tony Goodman is housed in 1B-18. This cell is ADA compliant.

Units 1-4 are inmate housing and nursing units with 20 cells typical to a unit. On unit 1B there is one officer on the floor 24/7. The inmates are in lockdown mode from 11:30 pm until 5 a.m. when they are awakened for breakfast. Inmates have access to TV, books and library services, and phone privileges. One item I observed to be corrected was to have a posting by the phone on how to request a TYY or text display device for hearing impaired. The warden has already addressed this issue and the memorandum is attached to this report. Unit 2B has nurses and staff 24/7 on the floor. Physical therapy is offered to inmates when ordered by the prison doctor. All the inmates in this unit are in segregation lockdown. There are two correctional officers and one nurse on duty 24/7. All of the signage in the housing units and hallways need to have Braille and have heights checked to be compliant with ADA. Unit 3 A is a nursing unit with 3 nurses on duty for inmates going or coming out of surgery. Units 1B and 2B have 34 out of the 40 accessible cells in housing units on the first floor are ADA compliant regarding architectural barriers. The six corner cells in the units do not comply with space needs for proper turning radius. Inmates in wheelchairs are not kept in these cells. The housing units on the second floor, 1A, 2A, 3A are not compliant and only accessible through a service elevator or stairways.

On the second floor, the pharmacy (E209) is only accessible by staff. The pharmacy stores the medicine and fills the prescriptions. They send the drugs to the units where nurses dispense the medicines.

Unit 4 A is a nursing unit on the second floor. Five cells were turned into offices. These beds do not count in the overall bed count because they are strictly pre- and post-op recovery units.

Unit 6A is the medical screen unit and clinic. While this unit has architectural barriers, any inmates requiring an accommodation could be moved to a housing unit that is accessible (unit 14 or 3B). There are four administrative segregation cells. Cell number four is being renovated to be ADA compliant. They are moving the metal bed to the end wall to provide proper turnaround radius, and installing a compliant stainless steel combo toilet and sink with suicide resistant grab bars.

The canteen has been renovated to have an accessible shelf.

The mental health department provides counselors and nurses. This unit conducts group therapy counseling sessions, and this space is not fully accessible. The prison alternatively delivers the

service by bringing group counseling in the housing units in the visitation areas. Individual counseling can occur in the mental health unit or in the individual housing units. Inmates request this service and activity by filling out a counselor request form and turning it in to the floor officer or unit mailbox.

K 212 is the education building and this space complies with ADA. Classrooms are accessible and bathrooms have been renovated to be compliant. The special education classroom is accessible and the adjoining bathroom is renovated. Inmates with disabilities can go after their GED here if they choose.

K 213 is the library for the facility. The library has undergone renovation to meet ADA requirements and made accommodations that include a lowered work counter, wider work carrels that can accommodate a wheel chair, and raised the heights of several reading tables to accommodate wheelchair heights and knee clearances. Bathrooms have been renovated and are compliant.

The law library has renovated the counter heights and cut outs to accommodate wheel chair access. There are work carrels that are ADA compliant and proper turn around radius.

Building 9 is the inmate visiting area for prison. The visitation rooms are ADA compliant. In this area an inmate can have contact and non-contact visitation. Hearings are also held in this space. The public bathrooms will to be upgraded and modified to be compliant. (The work repair list is attached to this report).

The chapel is ADA compliant. Access and aisle-ways are compliant. The inmate and staff bathrooms have been modified and are compliant. The water fountain is compliant. The inmate bathroom has the rear grab bar behind the flush valve.

Unit 10A and B is mental health unit and is a split-level housing unit that does not comply with ADA. Unit 11 in general population inmates and is a split-level unit that does not comply. Unit 12 B is a mental health unit and is a split-level housing unit that does not comply with ADA. Unit 13 A B and C are general population and are split-level housing units that does not comply with ADA. Units 10-13 are not compliant because of level changes that are structural in the units design. However, Unit B1 provides the alternate delivery of acute care for mentally disturbed inmates.

Unit 14 is a general population dorm built in 1998. This unit is ADA compliant. The recreation rooms have been used for housing due to overcrowding, but they are moving the inmates and removing the beds, and the space will be used for recreation by December. Unit 14 B2 has 59 beds and is a transient unit for inmates awaiting transfer or classification. All of the housing areas, bathrooms, and support spaces are ADA compliant. There are 350 inmates that have been prescribed to be a bottom bunk in Unit 14. The recreation spaces include basketball court, weight area and an outdoor fountain. Inmates can receive programs, services and activities regardless of being disabled or being fully able bodied in Unit 14. Inmates with disabilities are housed in Unit 14 along with able-bodied inmates.

The gym is an accessible and a compliant building. The bathrooms have been renovated and awaiting a grab bar behind the toilet flusher to be fully compliant.

The dining hall has two dining rooms. The sitting areas comply with tables that have cutouts for persons in wheelchairs to sit at. The bathrooms have been modified and are compliant.

In summary, the Augusta State Medical Prison has 34 plus ADA compliant cells plus several hundred accessible beds in the dorm building 14. Programs, services, and activities are brought to inmates equally in medical and nursing units, to inmates in isolation and segregation (pending their restrictions due to security and or loss of privileges due to behavior infractions). The items, including but not limited to, have been resolved and brought up to standards (please refer to the repair chart attached to this report):

1. Seg Cell 6A4
2. Cell 1B18
3. Shower C102
4. Bathtub room C125
5. Dayroom Shower in C102
6. Law library
7. Library classroom toilets
8. Classrooms 1-5
9. Outdoor seating area
10. Physical therapy toilet A151B
11. Physical therapy water fountain (please check on)
12. The infirmary and shower room H102 and Bathtub H125 and bathrooms are not in an accessible unit and alternative delivery of these services has been established.
13. The route to the dining room and gym path of travel slopes are compliant with exiting installation requirements and inmates needing assistance are given such if slope is a challenge.
14. Gym shower and toilet
15. Track and ball field water fountain
16. Chapel and visitation areas toilets
17. Commissary and canteen spaces counter height

## OPINION

Augusta State Medical Prison is ADA compliant at the time of this report. All alterations will be completed by the end of January 2009. The areas still being altered will not negatively affect the accessibility of available programs or services to Miller, Goodman or any other inmate in a wheelchair or with mobility impairments. In areas where changes can not be made, due to a fundamental alteration or undue financial burden on the prison, alternate methods are available to provide effective accessibility to services and programs for wheelchair bound inmates as well as other disabled inmates.

### Georgia State Prison

The mission of Georgia State Prison is to house inmates who are disciplinary problems and continue to disrupt the operations of other prisons. Wheelchair inmates with disciplinary issues are housed in the infirmary or K building.

Georgia State Prison was built in 1930's and it is not structurally feasible to retrofit. However, alternative methods are used to assist wheelchair inmates in and out of their cells, to the shower and yard call. The officers on duty in these areas assist the inmates with their wheelchairs. Alternatively, programs and services are brought to the inmate, including but not limited to food,

chapel, and library. A list of the services are attached this report. It is important to keep in mind that these inmates have restrictions due to their disciplinary classification. Inmates in K unit are restricted to 23 hours in cell and allowed out only for 1 hour for recreation per day.

The Standard Operating Procedure was amended and effective October 15, 2007 which states that disabled inmates with disciplinary problems will be sent to GD&CP as the primary facility. GD&CP's Hi-Max unit is ADA compliant. GSP is the secondary facility. Currently, only four wheelchair inmates remain at GSP and DOC is in the process of having them transferred once space is found.

Even though K building at GSP can not be made compliant, it does not violate the ADA or 504 because it would constitute an undue financial burden on the entity. Both laws allow for this exception. Retro-fitting K building alone would cost approximately $500,000.00.

Should inmates with mobility impairments remain at GSP, alterations that are feasible will be completed by February 2009. A work log for GSP is attached to this report.

## OPINION

GSP is not ADA compliant; however, it is not in violation of the ADA or 504. The ADA and 504 have an exception to the mandatory alterations of a prison if it would constitute an undue financial burden on the entity. This exception applies to GSP. Inmates housed at GSP are there for disciplinary reasons and have restrictions; however, some programs and services are still available to them. All other feasible alterations at GSP as outlined in the work log will be made by February 2009; however, if should DOC decides to no longer house wheelchair inmates at GSP, these alterations will not be necessary.

### Georgia Diagnostic and Classification Prison

The mission of the Georgia Diagnostic and Classification Prison is to evaluate and classify inmates based on security levels, mental status and physical status. Inmates with mobility impairments, who are classified to be in general population, will not be housed at Georgia Diagnostic. They will be housed at one of six other institutions including ASMP. Georgia Diagnostic will only house those inmates using wheelchairs with disciplinary problems or high security based on disciplinary problems in the Hi-Max unit. (See SOP IIC05-0001 attached).

I did not have an opportunity to inspect GD&CP prior to this report but I will do so and amend this report if necessary. Relying on my conversations with Steve Jones, report of Mr. Mazz and the work log of GD&CP (attached to this report), the Hi-Max facility at GD&CP is ADA compliant.

The infirmary is located in a much older part of the facility and it will take substantial funds and time to retro-fit the cell and shower areas. DOC will have these areas updated and ADA compliant by the end of January 2009.

Programs and services are available to all inmates as outlined in the program and services schedule attached to this report.

## OPINION

GD&CP Hi-Max unit is ADA compliant. Programs and services are available and accessible by disabled inmates. The infirmary will be ADA compliant by the end of January 2009. This is an older part of the facility and alterations are more complicated but DOC has already assessed the area and is taking steps to make this area ADA compliant.

Respectfully yours,

Randall Atlas Ph.D.,AIA,CPP