1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

TRACY ANTHONY MILLER,

      Plaintiff,

vs.                          CIVIL ACTION FILE
                             NO. 6:98-CV-109-JEG
HUGH SMITH, et al.,

      Defendants.
_____
TONY GOODMAN,

      Plaintiff,

vs.                          CIVIL ACTION FILE
                             NO. 6:99-CV-012-JEG
JAMES E. DONALD, et al.,

      Defendants.
_____

VOLUME II

VIDEOTAPED DEPOSITION

OF

DR. RANDALL ATLAS

1111 Brickell Avenue
Suite 2500
Miami, FL  33131

Friday, January 23, 2009
10:00 a.m. - 4:35 p.m.

1          MS. SHALF: Can you run a test for

2      me to see -- yes, you're working.

3          THE VIDEOGRAPHER:  Ready?

4          Okay, stand by.  We're back on video

5      record, approximately 1:20, tape 2 of the

6      videotaped deposition of Randall Atlas, Ph.D.

7   BY MS. SHALF:

8      Q    Good afternoon, Dr. Atlas.  I want to

9   just go back to a couple of things we were

10  talking about before the break, just to pick up

11  some details.

12         We were talking about UFAS and ADAAG

13  and how there could be a choice between the two.

14  Can you pick one or the other standard?  Is it

15  system-wide?  Or would you pick it for the prison

16  or would you pick it for the building or the

17  project?

18         How does that work?

19     A    It's my understanding you pick it

20  system-wide, not building by building.

21     Q    Okay, and do you know if UFAS or ADAAG

22  was the standard that the Department of

23  Corrections selected?

24     A    Yes, I know the answer.

25     Q    Okay, and what is the answer?

1       A       ADAAG.

2       Q       ADAAG?  Okay.  And how do you know that?

3       A       From the report that was done as part

of my appendix by the architectural barrier group

that I don't have in front of me, because you

have all my records, but that other group that

did that report back in '90-something.

8       Q       So in that report they were going by

the ADAAG guidelines?

10      A       Yes.

11      Q       I show you what is marked as Exhibit F.

Apologize for the yellow sticky notes, I didn't

have tab markers.

14      A       Yes, this is a copy of my stuff.

15      Q       Is that your expert report?

16      A       Yes, and my appendices.

17      Q       Can we go to Exhibit A, which should be

your CV?  Is that a true and correct copy of your

CV?

20      A       Yes.

21      Q       Is there a more up-to-date copy in

existence, or --

23      A       Yes.

24      Q       Could you produce -- oh, that's this

here?  Okay, then we'll go ahead and go with that.

1              I notice you had a lot of training

2    seminars that you have given, some of which are

3    specifically on ADA?

4         A    Yes.

5         Q    And a lot of those were in 1995, 1996?

6         A    Yes.

7         Q    How many of those training or

8    presentations have you done since say 1996?

9         A    None, if they haven't been marked on

10   there.

11        Q    Can you identify any for me, please?  I

12   mean is there one that sort of sticks out in your

13   mind that you remember doing?

14        A    I remember doing all of them.  They're,

15   starting on page 25, different projects I worked

16   on:  The presentations for the Department of

17   Justice all over the country, in Atlanta, Oregon,

18   Colorado.

19             So on page 25 and 26 of my resumé it

20   outlines my experience on ADA and accessibility

21   issues and publications.

22        Q    How many of those have you done since

23   1995 -- sorry, 1996?

24        A    As stated earlier, what you see is what

25   you get.  None.

```
 1        Q      Have you ever trained or consulted on

 2   Section 504?

 3        A      Have I been trained or have I trained?

 4        Q      Trained others.

 5        A      No.

 6        Q      Or consulted, in the projects where you

 7   consult with entities that are apparently

 8   designing facilities, have you consulted on

 9   Section 504?

10        A      No.

11        Q      Do you design -- when you do the

12   consulting do you design the prisons and cells

13   yourself?  Do you sit down and draw them as the

14   architect?

15               Or are you just consulting and letting

16   them know what the guidelines should be?

17        A      Both.

18        Q      Okay, so you do design?

19        A      Yes.

20        Q      And how recently have you done work

21   like that?

22        A      Last year.  I have a prison project

23   that's on-board last year that's carrying over

24   into this year, so it's still ongoing.

25        Q      Okay, and that's one where you're
```

1    designing accessible cells?

2        A    Yes, well, I do review for security,

3    safety, and accessibility issues.

4        Q    Well, then for the consulting -- I'm

5    sorry, for the designing, how recently have you

6    designed accessible cells, or been doing the

7    consulting for accessible cells, as opposed to

8    other reasons, like security and so forth?

9        A    It all happens at the same time.

10        Q    Okay, so it's one project you're doing

11    security, ADA, everything?

12        A    Right, I'll be given a set of plans and

13    specs, and I review that for compliance for ADA

14    as well as any security issues I might have.

15        Q    You review the plans, but do you design

16    them yourself?

17        A    It doesn't work like that in the

18    architectural field, so that's why it's not a yes

19    or a no answer.

20            The days where you put pencil to paper

21    and the architect draws --

22        Q    Well --

23            THE REPORTER:  One at a time, please.

24            THE WITNESS:  Architecture as it

25        stands for the last 15 years is a

1   participatory, group participation

2   project.  No one person does everything.

3   And so it would be inaccurate for me to

4   say yes, I have put paper to pencil and

5   designed a facility.

6       I participate among as many as a

7   dozen other people in designing something

8   and/or reviewing things.

9       And it's not uncommon, it would be

10  sort of like your paralegal drafts

11  something for you, and you put your spin

12  and your polish on it, do you draft every

13  single world of every document you've

14  ever done?  No.  So that's the analogy I

15  can give you.

16      So I'm not overstating my worth, but

17  I'm not understating my value.

18  BY MS. SHALF:

19  Q    Okay, my question was simply are you --

20  let's say are you involved in the design?

21  A    Yes.

22  Q    If you turn to Exhibit C of your

23  report, can you identify that for me, please?

24  A    This is my case list of my role as an

25  expert in the last 15 years worth of cases.  You

1   have a more recent version of it sitting on your

2   desk there.  And it's organized from the first --

3   on the first page is the most distant past and

4   the last page would be the most current recent.

5        Q    How often have you, let's start with

6   done an investigation in an ADA prison case?

7        A    Just a few.  Maybe half a dozen cases.

8        Q    How many have you done, let's go a

9   little bit more broadly, I should have started

10  with this:  How many ADA cases have you done?

11       A    Maybe 12 to 15.

12       Q    And of those cases in which you just

13  did an investigation, how many of those did you

14  testify at trial in, testify at a trial or hearing?

15       A    I don't remember specifically.  The

16  good news is I have it marked in here, so I don't

17  have to remember anymore.

18       Q    Okay, have you ever been disqualified

19  or not qualified as an expert for -- let's start

20  with at all?

21       A    No.

22       Q    Let me ask you about your process of

23  retaining you in this case.  How did you come to

24  be associated with this case?

25       A    I received a call from Miss Williams

1    regarding this case.  I was asked to review

2    files -- I may have been first contacted by her

3    paralegal, but shortly thereafter I heard from

4    Miss Williams, and asked to review documents that

5    involved a case of two different inmates'

6    lawsuits where they were challenge ADA compliance

7    at some of the facilities at the Georgia

8    Department of Corrections.

9        Q      And when were you contacted by, well,

10   her paralegal, since that was the first contact?

11       A      I don't have my receipts, that was all

12   in the file you took away, but I'll give you an

13   approximate, I want to say it's approximately

14   September of last year.

15              I don't remember the date.

16       Q      And how often have you spoken with

17   Miss Williams or Miss Teaster or a paralegal or

18   someone else in the AG's office?

19       A      Regarding this case?

20       Q      Yes.

21       A      I'm not sure how to answer the

22   question.  I haven't counted, but maybe 15 or 20

23   times.

24       Q      Did you discuss the substance of the

25   case, or were those just logistical discussions?

1       A       Probably two-thirds were logistics and

2   a third were content.

3       Q       And of those substantive discussions

4   you had, you don't have to recall every single

5   conversation or every single detail, but what was

6   the general nature of the substance?

7       A       Mostly about what documents I was

8   receiving and who I could contact from the

9   different prisons for their architectural

10  divisions, background as far as who these inmates

11  were and their behavior and activities.

12          And just helping me go over the

13  documents that were sent to me, when they came

14  and what they were doing, and helping me

15  understand that this case is about what is being

16  done to fix the situation, not necessarily what

17  was the condition of affairs back when the

18  lawsuit was filed.

19          So a lot of what the focus of this

20  particular case, which is unusual for me as an

21  expert, deals with remedial measures as compared

22  to the clock stopping when the lawsuit starts.

23      Q       So the scope of what you were asked to

24  do was not to evaluate whether the prisons were

25  in compliance at some earlier time, but whether

1    they're currently in compliance?

2         A      Yes, Ma'am.

3         Q      And that was, Miss Williams advised you

4    that was the scope of your work?

5         A      Yes.

6         Q      What were you told about, you mentioned

7    the inmates and their activities, what were you

8    told about them?

9         A      Little bit of background about what

10   they were doing in prison, their behavioral

11   activities while they were in prison, and the

12   reason why they were classified as high security.

13        Q      So it's your understanding Mr. Miller

14   is classified as high or maximum security?

15        A      I believe so.

16        Q      And that Mr. Goodman was classified as

17   high or maximum security?

18        A      Yes.  It's been my understanding that

19   these inmates were not general-population

20   inmates; that they've always been in either

21   segregation or lockdown for the majority of their

22   time.

23        Q      Okay, but that -- what I'm

24   distinguishing though is their actual

25   classification, not --

1      A      I have not been privy to their records,
2    so I don't know.
3      Q      I want you to keep your report handy,
4    and while I'm marking these I'll go ahead and ask
5    you a few more questions about what activities
6    you have been informed these inmates were doing,
7    or what else you learned about the inmates
8    that -- let's just say what else you may know
9    about the inmates.
10      A      Is that a question?
11      Q      Yes, what else other than their -- that
12    they had always been in disciplinary or
13    segregation?
14      A      It's my understanding that both
15    inmates, over a period of years, engaged in
16    numerous verbal and physical assaults on staff;
17    that they engaged in a continual barrage of
18    challenges physically and emotionally to either
19    the inmates around them and/or the staff and/or
20    administrative people; that they were
21    uncooperative in their medical efforts; that they
22    were uncooperative in their rehabilitative
23    efforts; and that they were uncooperative in
24    their daily-activity efforts.
25            That's the most neutral way I could put

1   that.

2       Q    So it's your understanding that

3   Mr. Miller engaged in numerous assaults on the

4   staff or other inmates?

5       A    That's correct.

6       Q    And that Mr. Goodman engaged in

7   numerous assaults on staff and other inmates?

8       A    Both verbally and physically.

9       Q    Okay, now all of that information, does

10  that affect your determination of whether the

11  facility -- and whether and to what extent the

12  facility complies with ADAAG or UFAS?

13      A    You asked two different questions in

14  that question.

15           Does it play a role in my consideration

16  as far as the providing of services and

17  activities to these inmates?  Yes.

18           Does it -- does their individual

19  activities determine whether a facility chooses

20  ADAAG or UFAS?  No.

21      Q    Okay, I wasn't asking about what they

22  choose ADAAG or UFAS, does it determine -- does

23  it affect your determination of the extent of

24  which a facility has to comply with the relevant

25  guidelines?

1    A    Indirectly, yes, because I'm looking at

2  inmates who are in a lockdown, behavioral,

3  disruptive mode, and my information-gathering is

4  focusing on what are the programs, services and

5  activities that are offered to inmates in a

6  segregation, high-security, disciplinary

7  environment.

8        So that's the importance of knowing

9  what their behavioral outcomes are, is by knowing

10  what is it that any inmate, regardless of ability

11  or disability, is entitled to if they're in

12  lockdown?  If they choose to be a problem child,

13  what are they entitled to?

14        In determining what they're entitled

15  to, I can then ask, fine, how are those programs,

16  services and activities delivered?  Are there any

17  architectural barriers that prevent you from

18  doing it?

19        And if they are, then how do you

20  alternatively deliver those programs, services

21  and activities?

22        And while I also looked at general

23  population issues, it may or may not be a direct

24  consideration of this case, only because of the

25  fact that these two men were in a perpetual state

1    of upset, would be about the most neutral word I

2    could use.

3        Q     If the inmate -- if an inmate were,

4    say, medium security and had few or no assaults

5    on his record, would you -- would that change

6    your analysis in your report of what was

7    appropriate?

8              Or would it just change the scope of

9    the report?

10       A     It would change the scope of the

11   report, not the process.

12             The focus here, because of this

13   particular litigation, is how does ADA impact on

14   a facility and operational level these two

15   inmates, who are of this particular security

16   behavioral, disciplinary classification, as

17   compared to if one of the inmates had been in a

18   therapeutic community and the other one had been

19   in a drug rehab or a lockdown and I had two

20   different environments, it wouldn't change my

21   analysis of it being compliant or not, but just

22   the scope being wider, going all the way from

23   low-security inmates with many more privileges

24   and services and activities to a very restrictive

25   amount of programs, services and activities that

1    would be reasonably accommodating an inmate who

2    is in disciplinary segregation or lockdown.

3         Q    And how did you determine what programs

4    or activities or services were available to these

5    inmates?

6              I mean, what did you base that on?

7         A    As I got to the different institutions

8    I asked the warden and/or deputy wardens or

9    assistant wardens, whatever is the correct title,

10   and I asked?  What happens in these spaces?

11             And I wrote them down, and then I asked

12   for documentation:  Okay, if we have -- if an

13   inmate in lockdown is entitled to chapel services

14   on Sunday, how is that implemented?  How is that

15   delivered?

16             Do you bring the chaplain to the

17   housing unit?  Do you cuff the inmate and shackle

18   him down and bring them to the chapel?

19             If they act out, what do you do then?

20             So I asked a series of questions.  I

21   first established by housing type, by security

22   classification, if you'll understand, what

23   happens in that space as far as programs,

24   activities and services, medical, recreation,

25   visiting, dining, cleaning, showering, the

1    gambit, based on my experience.

2         And then I just went down the checklist

3    say:  Great, what's your policies and procedures?

4    What's your post orders?  Where is your

5    documentation?  Where is your calendars of how --

6    you know, when do you have -- when do the

7    counselors come?  When do they issue medicines

8    and pills?  How often do the nurses come?

9         When do you, you know, if they're in

10   lockdown 23 hours a day, when do they get their

11   one hour?  Where do they go when they have their

12   one-hour rec break?  Do they stay in their cells?

13   Do they go outside?  If it's nasty out, what do

14   you do then?  Do they get access to the gym?

15        And I just kept asking questions until

16   I had a reasonably good idea that in that

17   security classification, this is the who, what,

18   why, when and how.

19   Q    And when you asked those questions you

20   were -- and when you did your analysis and your

21   report and determined the scope of what you

22   needed to be looking at, you were operating under

23   the assumption that these inmates were high

24   security and did not have general access to

25   inmates that would be in a general-population

1    setting?

2        A    To the best of my knowledge, yes.

3            And I qualify that because -- the

4    qualification is that what you didn't ask as part

5    of that question was a marker in time.  And so I

6    went with the information of present day, not

7    over the last decade that these men have been in

8    and out of facilities, and could they have been

9    in general population eight years ago?  Could

10   have been, should have been, I don't know, don't

11   really care.

12           The issue here is -- my scope was very

13   narrow and focused about these two men are housed

14   where they are today, what are the activities,

15   programs and services that they -- are available

16   and should be available and could be available,

17   and what is the Department doing to make it so?

18       Q    And at the time that you visited

19   Augusta in particular, Mr. Miller was in a

20   segregation cell, is that correct?

21       A    I believe so.  I marked in my report

22   which cells they were in.

23           And, for example, just on that note

24   alone, I was paying attention to where I saw both

25   men at, and that is different than where Mr. Mazz

 1    saw each of the men.

 2            So even if you notice, just over the

 3    course of a year, they were moved from different

 4    cells where that were year ago from where I saw

 5    them subsequently.

 6        Q     Okay, but you didn't look at the cells

 7    where they had been previously or that Mr. Mazz

 8    saw them in, you looked at the cells where they

 9    were currently?

10        A     Correct, with the caveat I looked at

11    the entire housing units.  So if they had been

12    juggled from the right side to the left side or

13    the second to the first floor, I did look at all

14    the facilities.  I did look at all of the cells.

15            But I paid special attention, because

16    that was most relevant for the purposes of my

17    investigation:  What have you done for me lately?

18    Where are they now?

19            And:  Are you doing what is reasonably

20    expected in today's goals and standards?

21            I wasn't privy to the 25 changes that

22    these guys have gone through over the last decade

23    back and forth between half a dozen difference

24    institutions.  Too much information, not my

25    problem.

1    Q    I hand you what is marked Exhibit G.

2    Would you take your time and look through that

3    and see whether those documents look familiar to

4    you?

5    A    Yes, they were attached to my report.

6    Q    I'm not certain they were attached to

7    your report --

8    A    I recognize a majority of them.

9    Q    But if you recognize them, that was my

10   question?

11   A    Yes, I recognize them and they were in

12   the materials that you're copying now.  They were

13   issued to me, the budget and this report, by Just

14   Accommodations, which is the name of the group I

15   was thinking of.

16        And the funding stuff, that was all

17   given to me by Miss Williams.

18   Q    I may come back to that, see what we

19   have time to do.

20        And you're being compensated for your

21   role in this case, is that correct?

22   A    Yes, Ma'am.

23   Q    Could you turn to Exhibit B, I believe

24   it is?

25   A    Yes.

```
 1        Q      And is this a negotiable structure
 2   here, or is this something that is just your
 3   standard retainer agreement?
 4        A      This is my standard retainer agreement.
 5        Q      Now I'd like to review what you've done
 6   to prepare for today's deposition.  Did you
 7   confer with counsel for the defendants?
 8        A      Yes.
 9        Q      Anyone else present other than
10   Miss Williams and perhaps Miss Teaster?
11        A      No.
12        Q      What did you discuss with them?
13        A      What documents I had.  There was
14   some -- what progress has been made since I did
15   my inspection back in November of
16   accommodating -- we put in the paper that by the
17   end of January most of these physical changes
18   would be conducted.  I was getting a progress
19   report of what had been done and what is yet to
20   be done.
21               I was given a report from Augusta, that
22   progress which I believe is --
23        Q      In the stack of documents?
24        A      -- over there, and that Augusta I think
25   is pretty much complete with their changes as per
```

```
 1    the original order for room-by-room changes.
 2            And if there was any other new progress
 3    with Georgia State Prison.
 4            And regarding -- I asked a little bit
 5    of information about the diagnostic center.
 6    Q      What documents did you -- I mean other
 7    than the documents that you were producing, did
 8    you go over specific documents in preparation for
 9    your deposition?
10    A      My report and Mr. Mazz's report.
11    Q      Let's go back to the substance of your
12    report.  Again, for the record, Exhibit G -- or
13    is it Exhibit F?
14    A      Exhibit F, subsection A.
15    Q      Actually, I think it's just the main
16    part of it, not the attachments.  It's here.
17    A      Okay, yes.
18    Q      We've talked about some of the steps
19    you took in preparing this report, but I want to
20    get all of the steps you went through.  Maybe
21    chronologically would be the best way to do it.
22            You reviewed documents?
23    A      Yes.
24    Q      And you -- did you review documents
25    addressing the inmates, or just documents like
```

1    the documents provided by the State?

2        A       Strictly the documents provided by the

3    State.

4        Q       And you toured the prisons, which was

5    when?

6        A       In November.

7        Q       November of 2008?

8        A       Yes.

9        Q       Beginning of the month?

10       A       I believe it's November 8th.  I don't

11   have my papers in front of me.

12       Q       Did you sit down and review the ADAAG

13   or various other guidelines?

14       A       Before I went?

15       Q       Either before or after.

16       A       Yes.

17       Q       Okay, and then presumably you wrote the

18   report.  Did you review Mr. Mazz's report while

19   you were in the process of compiling this report

20   and doing your analysis?

21       A       Yes.

22       Q       Did you disagree with his findings, or

23   did you just look at it and then go and do your

24   own report?

25       A       Well, let me qualify my answer.  There

1    is sort of -- that's a two-part question.

2              Did I review Mr. Mazz's report?  Yes.

3              Did I agree with what he found?  Yes

4    and no.  I don't disagree with his architectural

5    findings.  What I disagree with is that his

6    findings are totally irrelevant.

7        Q     Why do you say that?

8        A     He did a Title III

9    architectural-barrier survey, and his findings

10   are correct.

11             So in order to answer your question

12   correctly, do I disagree with his findings?  No,

13   the height of the toilet was 17 inches or 15

14   inches or whatever it was, and I'm not

15   disagreeing with what he found.

16             I'm disagreeing with the relevance of

17   what he found is absolutely, positively not

18   applicable for Title II; that it is absolutely,

19   positively applicable for Title III.

20       Q     Okay.

21       A     And --

22       Q     Why is it not applicable for Title II?

23       A     Because of the explicit wording under

24   Title II and the CFR regulations that I don't

25   have to have every place and every facility

1    architecturally barrier-free if, a big if, that

2    I'm able to provide those programs, services and

3    activities and deliver that alternatively.

4        Q     Okay, and again, going back to the

5    effective date, that's irrespective of whether

6    the building was built before or after the

7    effective date?

8        A     Correct.  In other words, ADA

9    essentially got grandfathered in, and whether I'm

10   dealing with an art-deco historic building here

11   in Miami Beach or Georgia State Prison built 80

12   years ago or a facility that was -- the new

13   housing unit at Augusta that came on-line in '98,

14   a Title II facility has the duty, the legal

15   responsibility to make their programs, services

16   and activities accessible.  That's what the

17   wording says.

18             And what that translates and means is

19   that I either -- it's not a -- Title II is not

20   about architectural-barrier removal, and this is

21   where Mr. Mazz's efforts are misguided and

22   misdirected.  Title II is absolutely, positively

23   about the delivery of programs, services and

24   activities, and explicitly laid out every which

25   way but loose.

1          Title III is about barrier removal.

2          So Mr. Mazz did a wonderful

3     architectural survey if this was a shopping

4     center.  However, being the fact it's a state

5     prison, it is meaningless.

6     Q     But if a prison were required to comply

7     with the same standards as Title III, then it

8     would have been a perfectly good report as far as

9     that goes?

10    A     Absolutely, correct.

11          However, that's not the case, so I

12    don't want it to be unfinished business --

13    Q     I understand.  Sure.

14    A     -- that absolutely, positively Title II

15    facilities are not to comply with the

16    Architectural Barrier Act of regulations of

17    Title III, with the caveat that new construction

18    after the date of '94 or '92, depending, you

19    know, once it gets implemented had to be more

20    considerate, maybe would be the right word, of

21    architectural barriers in new construction --

22    newer construction, but anything prior to when

23    ADA was even passed in 1990, there was no

24    obligation under a Title II facility to go in

25    there and remove those barriers.

1      What they had to do, absolutely,

2  positively, was make sure they had their mission

3  defined of what happened in that space and make

4  sure that they deliver those services.

5          And if they have to move the services,

6  sobeit.  If they have to cancel the services,

7  sobeit.  If they have to have someone come in and

8  sign, or do it in Braille or do a hat dance on

9  the table, whatever it is, they had to make it so.

10     Q     Okay, but they didn't have to strictly

11  comply with the measurements and doorways?

12     A     Correct.

13     Q     Exhibit E to your report is the work

14  list, or work log -- oh, is it not?  It's

15  mislabeled.

16          Go to the next exhibit then.

17          MS. WILLIAMS:  Right here.

18          THE WITNESS:  Okay, yes, got it.

19  BY MS. SHALF:

20     Q     It's just the stickies are off, sorry.

21  This work log, is this something you took part in

22  compiling?

23     A     No, Ma'am.

24     Q     This is something provided to you by

25  the State of Georgia?

```
 1        A     Yes, Ma'am.

 2        Q     So this was performed and this work

 3   list was compiled before you got involved in the

 4   case?

 5        A     Yes, Ma'am.  And my only role was

 6   merely to observe, acknowledge it.

 7              And I asked questions about progress, I

 8   guess that would be a good way of putting it,

 9   meaning:  All right, so here, you've identified

10   your, what we called in the architectural world a

11   punch list, how are you coming along on the punch

12   list?

13              When are you going to get done so I can

14   report, as part of my progress, are you making a

15   good effort, a reasonable effort in complying

16   with the intent of the courts and/or the court

17   order to deal with these reasonable

18   accommodations or not?

19              And, if so, what's being done about it?

20        Q     And a reasonable intent to comply with

21   the ADA is all that, in your view, is required?

22        A     Okay, that was a quicksand question.

23   Restate that again, please.

24        Q     I said a reasonable intent to comply

25   with the -- I will actually go back and read your
```

1    testimony.  You said a reasonable effort in

2    complying with the intent of the courts and/or

3    the court order.

4        A    Correct, I stand by that.

5        Q    Okay --

6        A    You're not required to take

7    extraordinary measures, and reasonable and

8    ordinary measures is the standard of care for the

9    courts.

10       Q    Did you review any expert reports

11   regarding Miller or Goodman's physical conditions?

12       A    No, Ma'am.

13       Q    Do you know specifically what their

14   physical conditions are, in terms of why they

15   were disabled, if they are disabled?

16       A    I know that they're in wheelchairs and

17   one has paralysis from, I'm not sure which

18   vertebrae down.

19            The other one alleges they're

20   handicapped and is a malingerer, based on the

21   information I've been provided.

22       Q    And do you remember which one is which?

23       A    Oh --

24       Q    If you don't, that's okay.

25       A    I'm not 100 percent.  I'm not 100

1    percent.

2            MR. BEACH:  I'm going object to the

3        comment about malingering based on lack

4        of foundation, being outside of the scope

5        of the expert's knowledge.

6    BY MS. SHALF:

7        Q    So when you were evaluating the prisons

8    did you take into account what their specific

9    disabilities or alleged disabilities were, or

10   were you looking at it from a perspective of any

11   person with a disability?

12       A    I was looking with any person with the

13   full range of legally-defined disabilities.

14            I was aware and considerate that I was

15   dealing with two inmates with mobility or alleged

16   mobility impairments; however, compliance with

17   ADA is not just about people in wheelchairs, but

18   also about all the other disabilities that are

19   possible.

20       Q    Did you prepare drafts of this report?

21       A    Yes, but I don't have a copy of it, and

22   it would get edited and saved as I got through it.

23       Q    So the changes you made, but there

24   weren't any printed copies of the draft?

25       A    No.

1    Q    Did you send the drafts to the State?

2    A    I sent the earlier draft to

3  Miss Williams to review, and she picked up a

4  couple good typos and spelling errors, but

5  content-wise, it's my content.

6    Q    Did you prepare any other memos or

7  reports other than this one that ended up being

8  your final report?

9    A    No, Ma'am, this is it.

10   Q    Are you aware of any self-analysis that

11  the Department of Corrections did?

12   A    I'm aware of it verbally, that there

13  was at some point in time an ADA, I'm not sure

14  what's the right word, auditor, assigned --

15  sorry, I'm trying to think of the right person --

16  a designated person within the department that is

17  supposed to be handling ADA issues that was there

18  in the mid '90s or something, and then that

19  person left and then the ball dropped, and then

20  it went very quiet for a long time.

21        And again, I have that information from

22  discussions with counsel, there's really not

23  documentation to that effect, and I don't have

24  any of the ADA reports or documentation of what

25  was done as their ADA compliance officer when

1    they were first starting their work.

2        Q    Did you review any transition plans

3    that you recall?

4        A    No, I did not.  I asked for them, and I

5    don't believe that has been either produced or is

6    available.

7        Q    Did you review any plans or work orders

8    from prior renovations, ADA-related renovations?

9        A    A qualified yes, in that the

10   documentation you have here for the construction

11   orders and the earlier report done by the

12   Accommodations Plus people going back into '98,

13   so there was awareness as far back in '98 that

14   they had to comply with ADA, and there was

15   reports done back in that point of time of

16   changes that needed to be done.

17       Q    Those reports were, those were reports

18   of changes that needed to be done.  Did you

19   review anything that indicated to you that the

20   changes were done?

21       A    No, I have nothing that's been provided.

22       Q    Did you review any SOPs or other

23   policies about placement of persons with

24   disabilities within the prison system?

25       A    Qualify that with what period of time

1   are we talking about?

2       Q      Well, I'm asking you --

3       A      Present or past?

4       Q      -- in preparing for the report, if you

5   reviewed any SOPs, any drafting or --

6       A      Yes, in present day, not in past.

7       Q      Okay, you mean you've reviewed the

8   present classification -- or, I'm sorry, housing

9   assignment policy, not past policies?

10      A      Correct.

11      Q      Okay.

12      A      And again, that's all attached here in

13  the back of the --

14      Q      So everything you reviewed in terms of

15  SOPs is either in the back of the report or maybe

16  this stack of documents you've --

17      A      Yes, Ma'am.

18             And again, as I was on-site and I would

19  ask questions, if I came up with an issue that

20  had not been addressed, like:  How does an inmate

21  notify you when they need to use a text-display

22  phone, or a TYY or a TDD, or whatever the

23  politically correct term is?

24             Well, you know, again, in prison jail

25  world:  Well, the inmate asks me.

1          Well, where is the written policies and

2    procedures so that I can document that you have a

3    written protocol or a standard operating

4    procedure that says, if I have this need, this is

5    how you provide and accommodate my need?

6          That is what is required as part of the

7    transition plan, so it removes all of the magic

8    and, you know, misinterpretation possibilities.

9          So there were policies and procedures

10   that were developed even as a result of my site

11   visit that helped clarify some of the issues of

12   how things get done.

13         And it wasn't they weren't getting

14   done, it's that sometimes they just weren't down

15   in writing or they weren't as clear as they

16   needed to be.

17      Q     And those are the documents that were

18   attached as Exhibit, hopefully it's marked right

19   as Exhibit D?

20         MS. WILLIAMS:  Here.

21         MS. SHALF:  Right, after Case List.

22         THE WITNESS:  Yes.  And if you see

23      the date on that, you can see it's

24      November 2008, so this was hot off the

25      press from me having discussions with the

1  powers that be:  We need some

2  clarification on these issues, about how

3  you assign people, how you classify them,

4  how you provide some of these services.

5      Again, as I understand on this

6  particular case, the issue here is:  How

7  do we solve the problem and make this

8  more user-friendly for the next

9  generation of people, as well as these

10  potential inmates, not necessarily what

11  was done ten years ago?

12      We know that it wasn't necessarily

13  as good as it could have been ten years

14  ago, but as I stated, everyone was doing

15  the best they could because they were

16  still trying to figure out what the

17  written word meant.

18      And we've learned over the last

19  decade how to implement the subtleties of

20  ADA, and especially in a corrections

21  environment, the policies and procedures

22  and operating, post orders of showering,

23  recreation, and visitors, and

24  communications, and education, and

25  feeding and et cetera, et cetera.

1    BY MS. SHALF:

2       Q      Okay, also at Exhibit H, it's just the

3    last page of that document there, you've got

4    another written policy that came out of your

5    investigation and advice to the State?

6       A      Yes, Ma'am.  We actually had a meeting

7    with the warden and we discussed, among the

8    assistant warden and the warden and counsel and

9    myself, and I asked a series of questions, very

10   pointed questions about what would be reasonable

11   that they could do on an architectural level, and

12   what was reasonable they could do on a

13   programmatic level -- and we'll do a quick

14   time-out I guess.

15            THE VIDEOGRAPHER:  Going off the

16        video record.

17                  (Recess)

18            THE WITNESS:  Back on record --

19            THE VIDEOGRAPHER:  Wait one second.

20        We're back on the video record.

21            THE WITNESS:  And the discussions

22        with the warden and the powers that be at

23        Georgia State Prison were the path of

24        least resistance and the path to the most

25        probability of success at the end of the

1    day of providing good services to the

2    inmates and the staff and the people

3    working there or the people living there

4    is to not have certain people classified

5    sent to the Georgia State Prison.

6         Let's put them in places where,

7    architecturally, there are less barriers

8    or no barriers, and where there's a

9    higher level of success at providing the

10   programs, services and activities without

11   going through extraordinary measures of

12   modifying the physical environment.

13        And Georgia State Prison, because of

14   the age of the institution and because of

15   the architecture of that institution,

16   would be beyond any reasonable

17   expectations that they could have a high

18   level of success there.

19        And the warden had basically

20   acknowledged that he had been trying for

21   a while to somehow have a bureaucratic

22   decision agreed upon that he is not the

23   right institution for these inmates to be

24   stationed at, and that his life would be

25   infinitely easier and simpler if we can

1     solve some of these classification

2     considerations and, as a result, let's

3     provide the best service for the inmates

4     that we can at institutions that are

5     designed, geared and staffed to be able

6     to do that.

7   BY MS. SHALF:

8     Q     Okay, now you mentioned the age of the

9   Georgia State Prison.  Did you visit K Building

10  in particular?

11    A     I did, and I'm drawing a blank right at

12  the moment which building that was.

13          But I can state that we did tour the

14  entire facility, including some of the units that

15  were abandoned because of age, and little center

16  courtyards, which are the very old-school part of

17  the buildings.

18    Q     Sure.  I'm talking about, K building is

19  the building, just assume with me, and I think

20  Pattie will agree, K building is the one that

21  the -- Mr. Miller and Mr. Goodman were housed in,

22  and they are still, last time I checked, units

23  that are being used to house prisoners.

24          It's units along one corridor with one

25  shower that goes with it.

1    A    Correct, I mean I even have a note in

2    my report the wheelchair -- inmates in

3    wheelchairs with disciplinary issues are housed

4    in the infirmary and/or K building.

5    Q    Okay, is K building the old-school, old

6    building from your observance of the facility?

7    A    It was -- it's middle-school.  It

8    wasn't quite old-school.

9         Clearly there isn't much of it on -- in

10   that campus that is newer construction, or within

11   the last decade or so, other than some of the

12   industries areas.

13        But the problem is that it was still

14   built pretty much in a linear-style design with

15   steel bars.  There are numerous structural

16   impediments and door-threshold issues and

17   challenges of that nature.

18   Q    Okay, and --

19   A    And absolutely, positively designed,

20   built and operated before ADA took place.

21   Q    Well, that's where I was going.  It

22   clearly has been substantially renovated sometime

23   since 1932 though, is that correct?

24   A    Yes.  And in fairness, it needs to be

25   defined about what the retrofitting, whether it

1    be mechanical retrofitted and the

2    air-conditioning and electrical and some bathroom

3    improvements.

4            And there have been -- every year

5    there's always a line-item budget to make

6    physical improvements, what they call capital

7    improvements to the prison.

8            I couldn't testify exactly what was

9    done in what year, and how much of it was

10   ADA-related and how much of it wasn't.  I don't

11   have that information.

12   Q     I'm sure, and I'm non asking you to.

13   I'm just asking you for a general assessment of

14   whether it appeared to you, when you toured K

15   building, that the building had been

16   substantially renovated at sometime between 1932

17   and the present?

18   A     I would believe so.  It doesn't look

19   like it's 1930s light fixtures or floor surfaces,

20   so it is well-maintained and it's clean and it's

21   orderly.

22           It's not a new-looking office building

23   or, you know, infirmary environment, but it was

24   doing the best it could for an older facility.

25   Q     Okay.  When you toured the prisons did

1    you take measurements?

2        A        Occasionally, but I have some pictures

3    on there that I did take some measurements, but

4    that was not the intention.

5            I was -- I did bring out, as you saw in

6    my report, some areas where there were some

7    obvious issues that needed improvement.

8            It wasn't my task to give the exact

9    measurement of the height of the signing of the

10   Braille, of the incorrect Braille signing or

11   the -- or, for example, what I typically found

12   was the grab bar behind the toilet was either not

13   the right height or was behind the flusher or

14   something of that nature.

15           The prison staff is very well aware of

16   what are the architectural requirements for a

17   grab bar or the Braille signage.  My job was to

18   remind them and bring it to their attention that

19   that particular outlet that they tried to do

20   wasn't done correctly, or that grab bar needs to

21   be adjusted, or:  You're missing some signage

22   somewhere, or something of that nature.

23           And then that would trigger a series of

24   questions:  All right, if you can't -- if this

25   toilet can't -- if this grab bar, if this is the

1    way we have to do it, where is there an

2    accessible toilet that's somewhere in the

3    neighborhood that they could go to?

4            So as long as I kept getting answers

5    from the prison staff:  Yeah, we can't solve the

6    problem in this bathroom by the cafeteria here, I

7    got three-foot walls I'm dealing with, and it's

8    always going to be -- I'm never going to get a

9    5-foot turning radius in this bathroom, I'd have

10   to blow up the unit to do that, but we have a

11   bathroom right down here, and all the person

12   needs to do is bring it to our attention he needs

13   to go to the bathroom, we'd be only too glad to,

14   you know, assist them, wheel them down, or let

15   them go to another adjoining bathroom.

16       Q    So the photographs that you took are

17   all the ones that you took on that CD?

18       A    Yes.

19       Q    We'll find it.

20            Did you take notes?

21       A    The notes are part of what you copied.

22       Q    Okay.

23       A    And it was from -- the basis of the

24   notes is what I developed my report from.

25       Q    That's what I was going to ask.

1          Did you only tour the prisons that one
2     time, or have you been in the prisons since then?
3          A     Just that one time in November.
4          Q     So you're not overseeing the work
5     that's being performed?
6          A     No, Ma'am.
7          Q     And did you draw up any plans for these
8     changes?
9          A     No, Ma'am.  That was not my scope.
10         Q     Have you seen the plans for the
11    changes, other than the work log?
12         A     Other than the work log, no.
13         Q     So you haven't personally viewed any of
14    the work that's been completed?
15         A     Only secondhand, in the -- for example
16    the Augusta report, where they've sent us
17    pictures, so I've viewed it in a technical term,
18    but I didn't view it in person.
19         Q     And so you didn't go there and measure
20    it and say:  Yes, that now measures a five-foot
21    circle?
22         A     I did not go there and develop a
23    personal accountability for every single
24    measurement.
25              I was given assurance by Steve Jones

1    and other people through that report that the

2    item that item was done and checked, and clearly

3    was identified from the original work order what

4    needed to be done.

5            And again, based on my discussions with

6    the prison staff, they knew -- they know ADAAG

7    just about as well as I do at this point, and are

8    more than competent to put up a grab rail or a

9    toilet seat or remove an entrance into a shower.

10   Q       Is it your understanding that prison

11   personnel are either people employed by the

12   Department of Corrections generally, or people

13   employed by the prison, or perhaps inmates, I

14   don't know, but not a private contractor being

15   used to make these alterations?

16   A       That's correct, that's my understanding.

17   Q       And when there are pauses I'm just

18   going -- some things we covered in the course of

19   our conversations, so I'm just trying to skip

20   over the parts we've already covered.

21           In Exhibit E, again this is the work

22   log --

23   A       Exhibit F, Section E?

24   Q       No, again -- can you help him find it?

25   The work log.

1         MS. WILLIAMS:  Right here.

2         THE WITNESS:  Okay, got it.

3    BY MS. SHALF:

4         Q       There are a number of places here where

5    a need for a change was indicated, but then the

6    comment says no change was made because of one

7    reason or another; that it would be too difficult

8    to do or, sometimes it just says no change.

9              In the cases where there was no change

10   made because it was problematic for one reason or

11   another, did you see any writing that was like by

12   the warden, saying the reasons why we're not

13   changing this is X, Y and Z?  Other than this

14   work log.

15        A       I saw nothing in writing.  I can only

16   testify that in my discussions with the

17   construction-management-architectural staff from

18   the department, that they were directed by that

19   particular warden that, if this was not a unit

20   where they were going to be housing persons with

21   disabilities, they didn't have to necessarily

22   make the architectural changes in there, because

23   there would be general-population inmates.

24             That the focus of this effort was to

25   make -- is to first define who has disabilities

1    and what their disabilities are.

2            Secondly, place the inmate with the

3    appropriate disability in the appropriate area

4    that could best respond to that particular

5    disability.  Clearly persons who were not

6    mobility-impaired but had sight issues or hearing

7    issues could be general population, could be

8    active and participate in work programs, and as

9    long as they weren't behavioral, problem

10   children, you know, could do their time and get

11   on with life.

12           If they were in a wheelchair and not a

13   problem child, then they could also be

14   accommodated in many of the other housing units.

15   I think I talked about that newer housing unit in

16   Augusta that had virtually hundreds of dorm beds,

17   it was an open-dorm setting, and they could

18   participate fully in the prison process and do

19   programs and visiting and rehab, whatever.

20           But there were certain units, for

21   example at Georgia State Prison or even in

22   Augusta where, that one unit in Augusta where it

23   was a two-story unit and you had a half a stair

24   up and a half a stair down, there was no way you

25   were going to make that an accessible unit, so

1   why bother?  Let's move on to some place that we

2   can make a different with.

3         And that's the kind of areas that we're

4   seeing here, where short of them blowing up that

5   housing unit and starting over, it would be an

6   extraordinary amount of difficulty and expense to

7   make those units -- and they would lose so many

8   beds, which they're clearly in need from

9   overcrowding, so this is about, you know,

10  considerate thought about where I can use these

11  resources best.

12        So when you see not -- where it says no

13  change or, do not -- not provided, you are seeing

14  the explanation in the notes here that these

15  recommendations for changing the bathroom or

16  adding the back grab bars or things of that

17  nature, these are recommendations in the units

18  that weren't going to be housing persons with

19  mobility impairment, so let's use our dollars

20  wisely in a unit where we can make a significant

21  difference.

22     Q     But you haven't seen, like a document

23  or a memo or something in writing from say the

24  warden or from the head of the Department of

25  Corrections or somebody on behalf of the State

1    saying:  The following are not in compliance with

2    ADA, but we believe it would be a fundamental

3    burden -- I mean a fundamental alteration or an

4    undue burden for the following reasons, so we're

5    not going to make those changes?

6         A    No, but I haven't seen it in writing,

7    but I asked the question verbally of the

8    department facility staff:  Well, how do you

9    know?

10            And they would turn and point and say:

11   Well, look, look at it.

12            I was directed by the assistant deputy

13   warden:  This is not going to be housing inmates

14   with disabilities or for mobility-impaired

15   disabilities, and therefore we're going to focus

16   here over on the medical unit, or the open-dorm

17   unit, or some other areas.

18            So my understanding based on direct

19   conversation with the staff was that the facility

20   staff were directed by the warden or deputy

21   warden, you know, the powers that be, that what

22   units were going to house persons with

23   disabilities, what units weren't.

24            And even to the point of what kind of

25   disabilities, so that if we had to make

1   accommodations for text-display devices or having

2   manuals in Braille or things of that nature, that

3   can be accommodated.

4          Like for example, like the reception

5   unit, inmates coming in, that needs to be an

6   accessible unit, and you have inmates that you're

7   first trying to find out what disabilities they

8   have, sight, hearing, mobility, whatever.

9          And there they would have -- need to

10  have documents in Braille, if they have an inmate

11  with vision impairment, or have a text-display

12  device in case they need to communicate with

13  them, or have someone that can sign, or have

14  wheelchair accessibility, or things of that

15  nature.

16          Other units that, once they've been

17  classified and sent to, that would be a conscious

18  decision that these units can't accommodate those

19  disabilities.

20     Q    How do you define, you've used this

21  term in your report, a fundamental alteration?

22  How do you define fundamental alteration?

23          First of all, where does that term come

24  from, fundamental alteration?  I'm not going to

25  be -- let me see if I can find a place where you

1    used it.

2        A       On page 3 of my report, this is, quote,

3    this is not my words, this is the CFR, Part 35,

4    under Section 35.150, Existing Facilities,

5    Subsection A-3:  This paragraph -- referring

6    above it to subpart D -- does not require a

7    public entity to take action that it can

8    demonstrate would result in a fundamental

9    alteration in the nature of the service, program

10   or activity, or in an undue financial or

11   administrative burden.

12       Q       Does it say undue financial or

13   administrative, or undue financial and

14   administration?

15       A       I'm assuming I cut and paste correctly,

16   so I'm going to say or.

17               It's possible I mis -- miscut and paste --

18       Q       Take a look at the top of page 4 of

19   your report.

20       A       4.  I still use the word or, not and.

21   I'm looking at an or.

22       Q       The version of the report I have says

23   and.

24               MS. WILLIAMS:  No, she's talking

25           about right --

1    BY MS. SHALF:

2        Q      Is that a different version of the

3    report?

4        A      No, it's just that I have my -- the

5    font I use, so when it got translated by computer

6    into --

7        Q      It might be easier if you just refer --

8            MS. WILLIAMS:  Here's where she's

9        talking about.  You're looking at a

10       different or or something.

11           THE WITNESS:  Oh, yes, it says undue

12       financial and administrative burdens.

13   BY MS. SHALF:

14       Q      Okay, just as an aside, I notice

15   there's some highlighting in a number of places

16   in your report.  What does that highlighting

17   signify?

18       A      That was me basically taking a stick

19   and hitting it upside your head to get your

20   attention.

21       Q      Just calling it out for me?

22       A      Yes.

23       Q      Now fundamental alteration in the

24   nature of a service, program or activity, if I've

25   got a doorway that is too narrow and I'd have to

1    rip it out and put in -- if it's 31 inches wide

2    and I would have to rip it out, put in a new

3    32-inch door, is that a fundamental alteration?

4        A      It depends.  If we look at our law

5    office here that we're so graciously in today,

6    here in Miami, and I'm dealing with dry wall with

7    some pretty flimsy oak wood that's been stained

8    and a door with some glass panels, I could

9    probably tear that out and do that without any --

10   it would be expensive, but it would be not a

11   great -- an undue hardship.

12            Why?  Because it's dry wall and wood.

13            In prison world, where I'm dealing with

14   reinforced concrete and/or steel and/or it may be

15   a structural wall, now opening up that 31-inch

16   opening to 34 to 36 inches and running the

17   conduit to run that door could be an astronomical

18   amount of inconvenience and expense.

19       Q      Okay, but is a physical alteration

20   something that constitutes, under this exception,

21   a fundamental alteration in the nature of a

22   service, program or activity -- can constitute?

23       A      It could, yes.

24       Q      Okay.

25       A      For example, if -- a good example would

1    be the housing units I was talking about earlier,

2    I believe at Augusta, where they're housing pods

3    and they have sort of a mid-level day room and

4    you have a half stair up and a half stair down,

5    if I'm going to make either one of those housing

6    levels accessible to the mezzanine or the lower

7    level and I've got five steps that I have to

8    either go up or go down, and I need to make that

9    100-percent accessible to a person in a

10   wheelchair, I would either have to -- I could

11   either raise the entire housing unit, submerge

12   that entire day room, buy a very expensive

13   elevator lift that would negotiate it sideways,

14   going both down and up.

15           And so having access to the activities

16   in the day room might be accessible because

17   that's on a common level, but the inmates living

18   there can't get access to the day room spaces, so

19   why bother?

20           So there the level change becomes a

21   fundamental -- in order for me to level the

22   playing field literally, it would be a

23   fundamental operation of what that housing unit

24   was, how it operated, how it was designed, which

25   was that an officer would be on a mid-level and I

1    could see effortlessly up and down to make sure

2    that the kids were playing nicely in the sandbox,

3    if I've changed that design and inhibit my

4    ability to supervise the inmates, I have

5    fundamentally altered the mission and the design

6    and the operation of that housing unit.

7        Q    Okay, so let's take for example

8    K building, where the cells were too difficult or

9    expensive to completely redo.

10            Now there, let's assume you could

11   design an accessible cell that would be at that

12   level of security, is the physical alteration of

13   that something that could constitute a

14   fundamental alteration in the nature of a

15   program, service or activity?

16            Or is it something more than just the

17   burden of the physical alteration?

18        A    Would you read back the question again?

19        Q    Is the physical alteration of

20   something, of a cell, something that could

21   constitute a fundamental alteration in the nature

22   of a program, service or activity?  Or is there

23   something more to it than just the fact of the

24   burden of the physical alteration?

25        A    It's yes to both of those.

1     If the problem is architectural in
2  nature, it could change the -- it could be an
3  undue hardship or burden for the function of that
4  space.

5     Or if we're talking about just
6  modifying one cell in a housing unit that has an
7  accessible path of travel, that's just more
8  inconvenience and money about making some choice
9  changes, but I'm not having to raise an entire
10  hallway or I'm not having to blow out structural
11  walls or things of that nature.

12     So, again, understanding the nature of
13  correctional-facility design, we're dealing with
14  tones of gray here, and there aren't many black
15  and white, you know, yes no answers.

16     If the physical change could be just
17  money, just, you know, put in a grab bar, that's
18  pretty self-evident.

19     If the issue here is that I can't get
20  to the bathroom, that makes it a fundamental
21  burden issue.

22  Q     Is that a fundamental alteration, can't
23  get to the bathroom, and so you would have to
24  change something structurally in order to make it
25  accessible?

1    A    I believe so, yes.

2    Q    How do you define undue burden?

3    A    Same thing.

4    Q    Okay.

5    A    Fundamental hardship, undue burden,

6    same thing.

7    Q    Fundamental alteration and undue burden

8    are the same thing?

9    A    Close, same intention, yes.

10   Q    Okay, so does it have to be just a

11   financial burden, or financial and administrative?

12   A    That depends.  You could make a case on

13   other way.

14        It could be just operational, it could

15   be just financial, and it could be both.  I could

16   give three examples for each one of those.

17        And the wording on Title II, you don't

18   even have to justify which one it is, as long as

19   you can come up with the fact that either

20   managerially-wise, administratively-wise it

21   becomes untenable or compromises your security,

22   or it could just be architecturally or

23   structurally an issue, or it could be a

24   combination of both.

25   Q    A little further down on that language,

1    we were talking about the financial and

2    administrative burdens, if you go further down,

3    starting with, you'll see that there's a section

4    cite there -- I'll wait for you to get to that

5    page.

6         A    Under general -- where are we?

7              MS. WILLIAMS:  Right here.

8              THE WITNESS:  Okay, got it.

9    BY MS. SHALF:

10        Q    Further down, and it says:  The

11   decision that compliance would result?

12        A    Correct.

13        Q    Okay, can you read that sentence, just

14   that sentence for me?

15        A    The decision that compliance would

16   result in such alteration or burdens must be made

17   by the head of a public entity or his or her

18   designee after considering all resources

19   available for use in the funding and operation of

20   the service, program or activity, and must be

21   accompanied by a written statement of the reasons

22   for reaching that conclusion.

23             And that is consistent with what I've

24   been saying.

25        Q    But you haven't seen any of those

1   writings that would comply with that?

2        A      Only with the qualifier of the new SOPs

3   that were attached as per our discussions.

4             But I had not seen anything in writing

5   prior, other than what is attached.

6             And there may be things there that the

7   Department hasn't shared with me.

8        Q      And then can you read the next sentence?

9        A      If an action would result in such an

10  alteration or such burden -- such burdens, a

11  public entity shall take any other actions that

12  would not result in such an alteration or such

13  burdens, but would nevertheless ensure that

14  individuals with disabilities receive the

15  benefits or services provided by the public entity.

16       Q      Okay, so let's say for example you have

17  a bathroom door that's too narrow, and you could

18  knock out the wall and like tear out the doorway

19  and you do that to correct the problem, and you

20  said that would be -- that could be, if it

21  involves let's say taking out the entire wall,

22  that could be a fundamental alteration?

23       A      Or a structural wall, for example,

24  where compromising it would compromise a couple

25  floors above it.

1      Q      Okay.

2      A      And, vice-versa, the other side of that

3  coin is that, if I can show there's a bathroom in

4  some adjoining building or unit that has been

5  modified and that is on an accessible path of

6  travel, then that becomes my reasonable

7  accommodation.

8          I don't have to have every bathroom in

9  every building to be 100-percent compliant under

10  Title II.

11          Title III, yes, but not Title II.

12      Q      And might it be possible that, instead

13  of tearing out an entire door or wall, there

14  would be like a different kind of door that could

15  be placed there that might make it accessible,

16  might widen the doorway?

17      A      Well, yes, there's architectural

18  devices used.  However, there are limitations.

19          For example, one of the tricks of the

20  trade is, where you have a 32-inch-wide door, you

21  can use hinges that come out at a right angle so

22  that you're not -- so it gets the swing of the

23  door out of the way so that you can use all 32

24  inches.

25          But if your opening is only 30 inches

1    or 28 inches, there's no amount of architectural

2    fun and games I can do that's going to make that

3    a 32-inch-wide opening.

4         So given the limitations of your

5    question, yes, there are some architectural

6    tricks of the trade that we can do.  But you also

7    have to know when to say when.

8         And it's been pretty much common

9    knowledge for the last decade that we have to

10   specify a 34-inch-wide door to get 32 inches

11   clear.

12        Q    Sure.

13        A    And so when the standard of care is 32

14   inches, we're not talking about a 32-inch-door

15   that you buy at Home Depot, it's, you have to --

16   you have to ask for a 36- or a 34-inch-door so

17   that the thickness of the door and the hinge and

18   the hardware to the opening of the door, you have

19   to be clear 32 inches.

20        If it's 31 and 7/8s, you don't comply,

21   and the inspector can come and say:  Tear it out.

22        So it's pretty unforgiving in that regard.

23        Q    Did you go through this work list and

24   see if, on the items that they said were too

25   burdensome, there could be alternatives that

1    might be less expensive that they weren't

2    thinking about?

3        A    No, Ma'am, that was not part of my

4    scope of work.

5        Q    Okay, so your job was not to go through

6    this work list and make sure that they were

7    thinking of everything they could think of in

8    terms of make these alterations?

9        A    Correct.

10       Q    If there is -- if you're starting anew

11   and not thinking about this particular scope of

12   work, but if you were looking at a facility and

13   trying to determine what they could do, does the

14   fundamental-alteration or undue-burden analysis

15   apply if -- anything you do, if any one

16   alteration would be an undue burden?

17            Or are you obligated to sit there and

18   think about all the different alternatives you

19   could have to make the structural alteration

20   before you then start going to putting

21   facilities -- or programs in other places?

22       A    It's a long question, and the answer is

23   it depends.

24            And the reason why it's not a yes/no

25   answer is because the way you worded the question

1    was too many qualifiers.

2          Why don't you restate it as a more

3    lasered question and I'll see if I can give you a

4    yes or no?

5    Q     I'm looking at my question.

6          If there is a doorway or some

7    architectural feature that does not comply with

8    the guidelines, and there are a number of

9    different alternatives to fixing that problem, --

10   A     Okay.

11   Q     -- are you obligated to consider all

12   of those alternatives and see which one might be

13   a less expensive change before you start going

14   down the road of making the programs or services

15   available at an alternative location or doing

16   other non-architectural changes?

17   A     No, because the word that you used in

18   the question was obligated.

19         There's nothing in the way this wording

20   is set that obligates you to google and spend an

21   hour on each door or each activity and come up

22   with every possible configuration.  There is

23   nothing.

24         And your question was very clear,

25   that's why I asked you the second time, to make

1      sure I was really clear on what you were asking.

2              Is there an obligation?  No.

3              Do you want the person to make a

4      reasonable effort?  Yes.

5              So that would be the standard of care,

6      is you don't want the person to be stonewalling

7      you or just taking the low road, but on the other

8      hand there is no obligation, as per your words,

9      that I have to look at every possibility and

10     every conceivable scenario for every single issue

11     at every single room at every single program at

12     every single facility.

13     Q      Let me ask the question this way:  If

14     there are a number of architectural features that

15     do not comply with the guidelines, could a prison

16     facility decide:  Okay, everywhere that we can

17     put a program in an alternative facility so that

18     we don't have to make any architectural changes,

19     we want to do that.

20             Can they go to that first, and only

21     make the architectural changes if there's just no

22     way to put the program or service in another

23     accessible space?

24     A      Yes, absolutely.

25             A good example of that, just so it's

1    clear on the record, of a good application, would

2    be in a school or university or an academic

3    building at a prison, same stuff, university

4    rule, prison rule, very close cousins, students

5    are just grooming to be inmates, and vice-versa,

6    the inmates are grooming to be students, close

7    cousins.

8            Now that being said, so you have a

9    classroom on a second floor, that you have a

10   history class, or your GED class for prison

11   world, it's on a second floor, it's a two-story

12   building, there isn't an elevator, it's not

13   accessible to people in wheelchairs.

14           At a university level or a prison level

15   I can say:  You know what?  I have an inmate who

16   is worthy or qualified to be in that class, I'm

17   going to move my classroom from classroom 201 to

18   room 104, let's make sure scheduling-wise I can

19   accommodate it the same day and time, I'll make

20   sure that that classroom becomes available, and

21   classroom 104 on the first floor is on an

22   accessible path of travel, I don't need to put in

23   a $50,000 elevator, it's all good.

24           I've made a reasonable accommodation

25   without making any architectural change.  I

1    provided the service of education.  I've made

2    sure that the person who is classified to go take

3    an education class for his GED can go take that

4    class and participate in his rehabilitation, and

5    life is good.  I haven't spent any money, I

6    haven't fundamentally altered the built

7    environment, and I've made a reasonable

8    accommodation.

9         And I, through good common sense, have

10   solved what would otherwise be a monster problem.

11        Q    Okay, but my question was whether a

12   prison or a public facility can go about it by

13   saying:  We don't want to do any changes unless

14   there's just no way to deliver the program or

15   services alternatively somewhere else, like

16   bringing it to the inmate's cell, or something

17   like that.

18        A    Oh, right, it's always -- it is always

19   the facility's -- the correct word, the entity's

20   prerogative to choose how they deliver that

21   service.

22        And clearly in the example I gave, if

23   you're doing a GED class for a general-population

24   inmate, they -- somebody who does not have

25   behavioral issues or security-risk issues and

1    they're entitled to and empowered and encouraged
2    to take education and better themselves, I have
3    an inmate who has medical issues, let's say for
4    example that they have tuberculosis, they're not
5    even a behavior problem, they have a contagious
6    disease, but they want to read, they want to have
7    education, they want to meet the pastor, they
8    want to have counseling, they want to have all
9    the other services, how do I provide those
10   services, they can't go to the classroom, take
11   their GED class, how do I bring that class GED
12   class to this inmate who is in a secure holding
13   cell in the medical unit with a viral infection
14   that makes him contagious to anything that moves?
15            I bring that service, they come in the
16   day-room space, I have my ventilation equipment
17   to protect the contamination, and I can provide
18   books back and forth, I can have the person talk
19   through a speaker phone, I deliver that service.
20            So it's never the intent to impose or
21   impede on management of how they deliver that
22   service.  They are the experts on the services
23   and activities that happen with that secure
24   environment.
25            It is not our job, not even my job as

1    an architect, to tell the warden how to run his

2    business.  They tell me how they want to run

3    business, and my job is to be creative and do

4    problem-solving and saying:  Okay, I can name

5    that tune in four beats, I think we can do it

6    this way.

7        Q    Okay, let's use a different example, if

8    I have an inmate who is not a disciplinary

9    problem, and let's suppose it's an inmate is who

10   is medium security, very few assaults on his

11   record, few if none, hopefully none, and that

12   able-bodied inmates in that same facility could

13   go to the prison library, and they could just

14   walk in at, you know, a certain time of the day

15   that the library is open, walk in and check out

16   books, read, whatever.

17            Is it acceptable, if that library is

18   not accessible to persons in wheelchairs, is it

19   acceptable for the prison to say:  We're not

20   going to renovate that library, all the people

21   who have mobility impairments have to stay in

22   their cells and they're just going to have to

23   request materials from the library?

24       A    Yes, that is acceptable, and that's

25   common practice.

1    And that needs to be handled first in

2    written policy and procedure.  It needs to be

3    identified as by the powers that be, as we just

4    read, it needs to be a written policy that, if I

5    have a person with mobility impairments, then

6    please write down, request the books that you'd

7    like, we will have a librarian get those books

8    and deliver them to you within a certain period

9    of time, 24 hours, 18 hours, whatever it might be.

10    No, I'm not room service, we're not at

11    the Georgia State Motel, we're at the Georgia

12    State Prison, so it's not saying I have to drop

13    what I'm doing and send a runner, but it does

14    mean that I have to have a reasonable plan that I

15    will deliver that book in a timely period.

16    Or for example, more likely, as the

17    inmates are getting up in age, they need books

18    with larger printer, you know, fonts, because

19    we're all hitting presbyopia days, and I need a

20    book with larger print, or I need a book that's

21    in Braille, or I need legal books to help file my

22    brief, whatever it might be, yes, it is a totally

23    acceptable and legitimate way of providing that

24    access to the resources of bringing --

25    essentially providing room service, providing the

1    service to the inmate in the security or safety

2    of that housing unit, as compared to sending the

3    inmate down to the library, because it's either

4    not accessible, or too many architectural

5    barriers, or the hallway -- you know, the space

6    between the bookshelves are too narrow, I can't

7    get a wheelchair through, all sorts of things

8    like that.

9        Q    I'm going back to your work log -- I'm

10   sorry I keep bouncing back and forth, I'm sort of

11   going from the general and then trying to use

12   specific examples -- with the work log, there are

13   some examples where the toilet center line is too

14   far away from the wall, and this goes back to my

15   questions about doing alternative alterations.

16            Is there an alternative to fix that

17   other than ripping out the toilet and putting it

18   closer?

19       A    No.

20       Q    So you can't, for instance, bump out

21   the wall a little bit with a bit of dry wall and

22   make the wall closer to the toilet?

23       A    No, the problem you have in doing that

24   is two issues.

25            One, structural.  It's my best educated

1    experience that nine out of ten times that wall
2    where that bathroom is, where the toilet is too
3    close to the wall, that's a poured-in-place or
4    reinforced concrete, it's a solid wall.  The wall
5    is not moving.
6           So you're going to be jackhammering,
7    you know, another four or eight inches out of it,
8    and then, when you put in a covering surface over
9    it, dry wall, even if it's secure, a lath, or
10   re-plastering it, the amount of effort it would
11   take to move that wall four inches is
12   extraordinary as far as the amount of manpower,
13   and again structural issues, because we don't
14   know if there's something that that wall is
15   holding up.
16      Q     Well, let's put aside moving the wall.
17   I'm talking about just adding plaster or dry
18   wall, you know, a few -- like an inch out, so
19   that the wall now has moved, has become -- or a
20   portion of the wall has just been built out
21   closer to the toilet.
22      A     I submit for your consideration that,
23   yes, they could do that.
24           However, that's not the problem here.
25   What you're reading there in your mind's eye,

```
 1    you're interpreting actually backwards.

 2              It's not that you have room to build

 3    out.  Yes, that would, you know, be slam-dunk,

 4    easy to do.

 5              The problem is that the center line is

 6    typically too close to the wall, and now you're

 7    having to make space.  The problem -- it's never

 8    a problem, you could put a toilet in the middle

 9    of this room.  If you have room, God bless you,

10    it's all good.

11              The problem is that, when you don't

12    have enough room to position the wheelchair to do

13    a side mount, that's the deal breaker here.  And

14    to be able to mount the grab bars.

15    Q       Isn't there also an issue though, if

16    the toilet is not close enough to the wall, that

17    you can't use the grab bars properly?

18    A       Correct, there is a relationship, but

19    you can extend out the grab bars.  That's a

20    doable trick.  And that's an external piece of

21    fixture and you just put the little metal place

22    in there so you can't hang yourself out.

23              So I can do that, but that's not

24    structurally altering the structural element of

25    the wall.  That's the furnishing you make itself.
```

1      And in fact you see some of the
2  pictures in the Augusta renovation where they
3  ran, you know, the handrails down, or out -- I
4  mean they got it, they understood they had to be
5  within this critical human-factor dimension, that
6  if you're sitting in the chair I need to be able
7  to support and push myself up or come across.
8      Q    On the last page of the work log it's
9  talking about Georgia Diagnostic.
10     A    Yes.
11     Q    It says:  Renovate this space for
12  accountability.  See plans, SJ, plans sent
13  10/23/08.
14          Do you know what that means?
15     A    No, Ma'am.
16     Q    Did you ask anybody what that meant?
17     A    No, I did not visit Georgia Diagnostic
18  and I haven't seen any documentation about what
19  exactly they're doing there.
20          And other than some discussion I've had
21  with counsel about who goes there and why are
22  they there and is it accessible, it's my
23  understanding that, while there's one unit there
24  that's going to be an accessible unit at Georgia
25  Diagnostic, and that that's being renovated to be

1    compliant, that Augusta is really our building of

2    choice to put people with disabilities.

3        Q    Okay, I think I'm actually going to get

4    into your report.  I kept promising we would.

5             You mentioned in your report you

6    reviewed diagrams of each prison.  Did you

7    produce those?

8        A    Yes, yes, Ma'am, they were attached.

9             Typically as I went to an institution I

10   asked for a site plan or a floor plan, and some

11   of they had were actually folded up, or 8-1/2 by

12   11, or some of them are 11 by 14.

13       Q    Now going through, starting at --

14   Pattie may need to help you with this again --

15   starting at page 3 of your report, all the way

16   over to --

17            MS. WILLIAMS:  Page 3 you said?

18            MS. SHALF:  Yes, starting with, I

19        think it's -- I think it starts with

20        Existing Facilities.

21            THE WITNESS:  Okay.

22            MS. SHALF:  Actually, it starts

23        with, actually, further up:  Department

24        of Justice, Office of the Attorney General.

25            THE WITNESS:  Okay.

1    BY MS. SHALF:

2        Q      Final Rule.  And we go all the way over

3    to page 13 of your report --

4        A      Okay.

5        Q      -- actually, potentially page 14, my

6    question is this appears to be sort of a reprint

7    of various guidelines?

8        A      Yes, Ma'am.

9        Q      Are those -- is that correct?

10       A      Yes.

11       Q      Just a copy and paste?

12       A      I went on to the DOJ's page, virtually

13   cut and, you know, apple, copied and paste, that

14   whole text, so that I could use that as the exact

15   wording of what they said was required.

16              And then again, jump into, all right,

17   so now this is what we've agreed to agree on, now

18   what have you done for me lately as far as the

19   specific institutions?

20       Q      On page 14 it -- close to the top it

21   says:  Cells with mobility features, and there's

22   that two-percent scoping requirement.

23       A      Yes, Ma'am.

24       Q      Can you explain how that applies?

25   Let's suppose we've got Augusta, with multiple

1    buildings, some of which have accessible cells,

2    some of which don't, and we also have the entire

3    prison system, how do you determine what the

4    scoping requirements should be for -- is it for

5    each building?  Is it for each prison?  Is it for

6    the system-wide?

7         Does it depend on classification?

8    A     That was actually specified and

9    elaborated on earlier in the discussion section.

10        Okay, here we go, if you'll look at my

11   page 9, your page --

12        MS. WILLIAMS:  It would be page 7.

13        THE WITNESS:  -- page 7 on your

14   thing, 12.4.2, Special Holding Housing

15   Cells or Rooms.

16        This section requires that, where

17   holding or housing cells or rooms are

18   provided for special purpose, at least

19   one of each type must be accessible.

20        MS. SHALF:  I'm not -- that's not

21   what mine says.

22        MR. BEACH:  Sarah, this is what it

23   says.

24        MS. SHALF:  Next page?  Okay, okay.

25        THE WITNESS:  And if you look right

1     above it, it talks about:  The minimum
2     scoping requirement of two percent is
3     based on the total number of housing or
4     holding cells provided in a facility.
5          And the term facility includes
6     buildings and/or structures on a site.
7  BY MS. SHALF:
8     Q     Okay, so for instance a facility would
9  be the entire all --
10    A     Georgia State Prison or Augusta.
11         Now there's been discussion about this,
12 and I don't know if I captured it in my report or
13 just read it on-line, because there's discussion
14 about a system-wide two percent as compared to
15 the question becomes:  Operationally, can I put
16 my two-percent all at one facility?  Or do I have
17 to distribute that two-percent system-wide?
18    Q     Sure.
19    A     There is debate, there isn't
20 necessarily a ruling, that was part of the new
21 '98 ruling and further discussion in 2004 about
22 the scoping issues, about whether that two or
23 three percent had to be system-wide, or whatever.
24         And to best of my knowledge, based on
25 my discussions with DOJ Civil Rights people

1    and/or the warden's and, you know, American

2    Corrections Association, the feeling right now is

3    that it's up to the department to decide where

4    they put that two percent; that many departments

5    have decided:  I can't make Georgia State Prison

6    accessible.  What am I pretending to know?

7         So I'm going to make -- I'm going to

8    create within the Georgia Department of

9    Corrections one or two facilities that I can

10   accommodate my range of disabilities, put 100

11   beds there, 200 beds there, whatever, if the

12   Georgia Department of Corrections has 20,000

13   inmates, then fine, I need to have 400 beds, and

14   I'll put them between two institutions, and that

15   takes care of my two percent, it's all good.

16        On the other hand, within that facility

17   that you've designated to provide accommodations,

18   you may just have, like I talked about in my

19   report how, if Augusta had so many inmates, they

20   had -- let's see if I have the exact wording

21   here, hold on -- on just where I'm doing the

22   summary of Augusta, it says:  In summary -- on

23   your page it's page 17, second paragraph -- in

24   summary, the Augusta State Medical Prison has

25   34-plus ADA-compliant cells, plus several hundred

1    accessible beds in the building number 14.

2              So excluding the dorm, which has bunk

3    beds which are accessible but they're not

4    high-security beds, even with that you have 34

5    legitimate, fully compliant, architecturally

6    barrier-free accessible cells in Augusta State

7    Medical.

8              And if you have general-population

9    inmates with disabilities, mobility impairments

10   to be specific, you could handle several hundred

11   persons with disabilities at Augusta, as compared

12   to Georgia State Prison, where life gets very

13   complicated.

14   Q     Does the scoping requirement, should it

15   be applied depending on classification level?

16   Like for instance at Augusta, you've got 34 cells

17   that are high security, and say a couple hundred

18   that are medium security, I'm not sure what the

19   security level is, do you have to take your

20   percentage based on like two percent of higher

21   security, or two percent of segregation cells,

22   two percent of disciplinary, isolation cells, and

23   so forth?

24             Do you have to break it down by

25   security classification?

1    A    The best answer I can give you is on

2  page -- is that section we were reading on page

3  9, I believe, the 12.4.2, where I have it

4  highlighted in yellow:

5         The section requires that, where

6  holding or housing cells or rooms are provided

7  for special purposes, at least one cell of each

8  type must be accessible.

9         This includes those for purposes of

10  protective custody, disciplinary detention, or

11  segregation, detox, medical isolation.

12         And the comment was:  These special

13  purposes have been added to the requirement.  The

14  interim rule, again, suggested but not

15  necessarily law as we say it, noted that:  An

16  accessible special holding or housing cell or

17  room may serve more than one purpose.  One

18  disability organization indicated that this

19  should only be permitted where inaccessible cells

20  serve also multiple purposes.

21         Otherwise, inmates with disabilities

22  may not have access to the same level of service

23  provided.

24         And, let's see --

25    Q    Can we go back to page 7, I think it

1    is, 12.4 --

2         A       Okay.

3         Q       -- holding or housing cells or rooms,

4    that's where you have the two-percent scoping

5    requirement, two percent but not less than one?

6         A       Yes, correct.

7         Q       Does, putting aside segregation and

8    isolation, those sort of special-purpose cells,

9    and looking now just at medium security, closed

10   security, maximum security, the different

11   classifications which every inmate will have

12   regardless of whether they've been good or bad,

13   do you -- does the scoping requirement apply per

14   classification, or does it apply -- can you have

15   all of your cells being medium-security cells and

16   like one as a maximum security?

17        A       The answer is, under the section where

18   it says Dispersion -- and again I'm qualifying

19   it, that it refers to the interim rule, because

20   it was not addressed in the '92 reqs -- the

21   interim rule which, for all intents and purposes,

22   either is as of '98, in the last decade, has been

23   the informal standard of care -- if we can agree

24   on that for the moment?

25              Dispersion, the interim ruled provided

1    that accessible cells shall be dispersed among

2    all categories and types of general housing and

3    holding areas.

4           The Final Rule does not contain a

5    requirement for dispersion of accessible cells.

6           So what this is saying is that the

7    Final Rule that was done earlier, it didn't even

8    know that it didn't know.  It didn't know to

9    bring that up as an issue.

10          But meanwhile, the wardens are trying,

11   and the superintendents are trying to figure out:

12   All right, what does that mean?  Can I put all my

13   accessible cells in an open dorm?  And meanwhile,

14   if I have lockdown people, I got an inmate with

15   disabilities who's in lockdown, what do I do now?

16          So they didn't want that to be the

17   experience, so that's why you're having this

18   discussion about dispersion.

19          So whether this is law or whether this

20   is guidelines, that's for you all to debate.  Not

21   my problem.

22          The issue becomes, from what my mission

23   was, which is to look at what does the facility

24   have now, and does it meet the -- and I'm going

25   to say the word intent of ADA, because as you can

1    see there are issues here that are subject to

2    interpretation, and part of this is about intent.

3            So yes, the answer to your question is

4    it is the intent of the ADA that each housing

5    type has some two-percent, or at least one cell

6    that can accommodate a person with disabilities,

7    because we never know where that person with

8    disabilities could come in in a general

9    population, and then be in seg because they're

10   acting out, and now they've got AIDS and now they

11   got to go to the medical unit.

12   Q     Let's move past the regulatory

13   discussion to page 15.  And first of all you say:

14   Inmates with mobility impairments are classified

15   and send to the Augusta facility.  That's the

16   second full paragraph, about halfway down.

17   A     Okay.

18   Q     What information did you base that

19   statement on?

20   A     Two things:  One, the discussion with

21   the wardens and superintendents of the two

22   facilities I went to, and discussions with

23   counsel, who had a direct link to the department

24   director and/or, you know, suits that made it

25   clear that, in the last year or two, or that

1    they've been dealing with this lawsuit, where are

2    you sending the people with disabilities?  What

3    institutions are you going to?  How are they

4    being classified?  Are they being gotten to and

5    services provided before they even get to an

6    institution so that that institution knows what

7    issues or concerns that inmate has and how can

8    they best be accommodated?

9        Q    Okay, so the SOP, which you said you

10   reviewed, the class that determines the

11   housing --

12       A    Placement?

13       Q    -- placement, it lists a number of

14   prisons other than Augusta State Medical Prison

15   where persons with disabilities are sent, isn't

16   that correct?

17       A    Yes.  But it's also important to

18   understand there's a wide range of disabilities,

19   so it needs to be cc'd to all the institutions on

20   a departmental level, so I understand why they do

21   it.  You can't stay in a box.

22            On the other hand, if for example some

23   inmate falls through the cracks or encounters --

24   develops a medical condition while they're there,

25   you know, with an aging population, they fall

1    down, they hurt while they're mowing the lawn,

2    whatever, all the institutions need to be on the

3    same page about where do you send a person with a

4    vision impairment, or a mobility impairment, or a

5    hearing impairment --

6         Q     Can you look at page -- at Exhibit F,

7    the actual Exhibit F.  It should be -- it's

8    Exhibit -- I'm sorry, Exhibit F to your report.

9         A     Okay.

10        Q     Can you go to the last page, please,

11   under Section K, Physical Limitation Transfers?

12        A     Okay.

13        Q     Can you go down to the second to the

14   last sentence before you get to the individually

15   numbered 1 and 2?

16        A     Okay.

17        Q     You say:  In particular, persons

18   confined to a wheelchair will be given priority

19   for housing at the following facilities as

20   defined by classification.

21              Listed there are more than one facility

22   and more than just Augusta for persons with --

23   who are confined to a wheelchair.

24        A     I don't understand why you are even

25   bringing this up.  You're looking at this, what